## THE STATE v. ARMSTRONG, *Appellant.*

### DIVISION TWO.

1. **Criminal Law :** INFORMATION, VERIFICATION OF. An information charging a criminal libel is sufficiently verified by an affidavit that the facts stated are true to affiant's best knowledge and belief. (*Following State v. Bennett,* 102 Mo. 356.)

2. ———: ———: DUPLICITY, WAIVER OF. It is too late after verdict to object to duplicity in an information for a misdemeanor.

3. **Criminal Libel :** PUBLICATION : INFORMATION. Where an information charges that the accused did wilfully and maliciously libel and defame the prosecutrix by sending her through the mails an envelope with certain libelous indorsements thereon, it is sufficient, though it does not charge that the matter complained of was wilfully and maliciously published.

4. ——— : INFORMATION. In a prosecution for sending through the mail an envelope with libelous matter thereon, the information is not defective because the libel is set out by pasting the original envelope in the information and making it a part thereof.

5. ——— : ———. The pasting of the original envelope in the information does not destroy its character as evidence.

6. ———. It is a libel to send through the mail an envelope having written thereon in large letters, " Bad debt collecting agency."

7. ——— : RESPONDEAT SUPERIOR. Where it appears that defendant employed the agency with knowledge of its methods and refused to stop its proceedings after having reason to believe it was sending the libelous matter to the prosecutrix, he is responsible for the acts of the agency.

8. ———: EVIDENCE. Evidence that the prosecutrix owed some debts was not competent for the defense.

9. **Constitution :.** CRIMINAL LIBEL : JURY. Under the constitution of Missouri, article 2, section 14, providing that in prosecutions for libel, " the jury, under the direction of the court, shall determine the law and the facts," it is not error for the court to instruct that the jurors are the judges of the law of libel as well as of the facts, and are not required to accept the instructions of the court as conclusive. (*Overruling State v. Hosmer,* 85 Mo. 553.)

*Appeal from St. Louis Court of Criminal Correction.*
HON. E. A. NOONAN, Judge.

AFFIRMED.

THIS is a charge of criminal libel. The defendant
lived in Mexico, Missouri, and the Sprague Collecting
Agency did business in Chicago, Illinois, and the
defendant's firm, consisting of Kabrich, Armstrong,
Atkins and Snyder, employed this agency to do some
collecting for them, and among the claims placed in its
hands was one of $5 against the prosecuting witness,
Mary Vincil. The agency used an envelope which bore
the device "bad debt" in large letters. The charge
consists in accusing the defendant of procuring the said
agency to send envelopes to the address of the said Mrs.
Mary Vincil, in St. Louis, from Chicago, Illinois, and
that the said words so used on the envelope are libel-
ous.

The information is as follows:

"STATE OF MISSOURI, ⎫
                     ⎬ ss.     In the St. Louis court of
"City of St. Louis. ⎭        criminal correction.

"ST. LOUIS, March 29, 1888.

"State of Missouri, ⎫
          Plaintiff, ⎪    Charged with criminal
          v.         ⎬    libel.
"A. G. Armstrong,    ⎪
          Defendant. ⎭

"Bernard Dierkes, assistant prosecuting attorney of
the St. Louis court of criminal correction, now here in
court on behalf of the state of Missouri, information
makes as follows: That A. G. Armstrong, of Mexico,
Audrain county, Missouri, in the city of St. Louis, on
the twenty-seventh day of March, 1888, and on divers
days in said year, did wilfully and maliciously libel
and defame one Mary Vincil, of the city of St. Louis,
by causing to be published and issued in said city, and

The State v. Armstrong.

by having sent through the mails, and put before the eyes of divers people in said city, a certain envelope, printing, writing, sign, representation and effigy, as follows:

BAD DEBT Collecting Agency, 218 La Salle St., Chicago.

Chicago, Ills.

March 26, 6:30 P. M.

R. R.

U. S. Postage Stamp.

Mrs. Mary Vincil,

c-o Scruggs, Vandervoort & Barney,

2 N. Beaumont Street.                     St. Louis, Mo.

Intending and meaning thereby to indicate to the public and to all persons seeing said writing, printing, sign, representation and effigy that she, the said Mary Vincil, was dishonest; that she did not pay her just debts; that she had been guilty of unfair dealing; that she was a 'dead beat,' tending to provoke the said Mary Vincil to wrath, to expose her to public hatred, contempt and ridicule, and to deprive her of the benefits of public confidence and social intercourse, that said envelope contained certain scurrilous, blackmailing and indecent allegations concerning said Mary Vincil as follows:

---

---

" 'SPRAGUE'S
" 'Bad  Debts

I                  " 'Collecting Agency.
                   " 'Agency's 4th Letter.

" 'CHICAGO, 3–26, 1888.

" 'Mrs. Mary Vincil,
       " 'c–o A. G. Armstrong :        $5.00
    " ' We find that the account which we notified you
some time ago is still unsettled. , Can you afford to have
the public know that you refuse to pay this bill.  You
may need credit again some time, but as long as this
account remains in this unsatisfactory manner it will be
hard for you to obtain it.  If you desire to have credit
with the merchants in your locality, and maintain a
reputation for honesty and fair dealing, you will adjust
this claim.  Call on or write the party, and make some
kind of a settlement at once.  If you will pay part of it
now, and make some arrangements for the balance, we
will not crowd you for awhile.  Have the party to
whom the bill is due write us at once, stating what
arrangements you have made, before we publish the
delinquent list of your town.  Very respectfully,
          " 'SPRAGUE'S COLLECTING AGENCY.
               " 'Per.'
    " 'P. S. Should you positively refuse to make any
arrangements for a liquidation of this claim, we feel
justified in advertising the same for sale in the news-
papers, as well as to send you a statement regularly
until the matter is settled.  A delinquent list is pub-
lished for the good and protection of the public, as well
as a guide for business men in extending credit, as it
contains the names of those who do not try to meet
their obligation.  Do not correspond with us.  Settle
the matter with the party to whom the account is due,
whose name was given in our former letter.'
    " That said envelope was known by the public to
contain said scurrilous and abusive matters, and said

Armstrong intended, by causing said matter to be sent to said Mary Vincil through the mails, to advertise her as a 'dead beat,' as dishonest, as 'poor pay,' as unfit to be trusted, as unfit for public confidence ; and said acts were done by said Armstrong to extort money from said Mary Vincil, under the pretense that she, the said Mary Vincil, was indebted to him, when such was not the fact, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the state.

"[ Signed ]               BERNARD DIERKES,
"Assistant Prosecuting Attorney St. Louis Court of Criminal Prosecution."

"STATE OF MISSOURI, ⎱ ss.
  "City of St. Louis, ⎰

"Mary Vincil, being duly sworn, upon her oath says that the facts stated in the above information are true, according to her best knowledge and belief.

"[ Signed ]              MRS. M. B. VINCIL.

"Sworn to and subscribed before me, this sixth day of April, 1888.

"[ Signed ]            MICHAEL J. KENEFICK."

The case as made by the evidence showed that defendant was a member of the firm of Kabrich & Co., merchants of Mexico, Missouri. Mrs. Vincil, the prosecuting witness, had in her girlhood and prior to her marriage, lived in Mexico. After her marriage she and her husband continued to live in Mexico, until he was killed in a railroad accident in 1880. After that, in the year 1881, she removed to St. Louis, and at the time of this prosecution she was clerking for Scruggs, Vandervoort & Barney, of St. Louis. According to the testimony of defendant, his firm claimed that she owed them an account of $3.70, due in 1881, and interest to the date of this prosecution, amounting in all to $5. This claim they placed in the hands of the Sprague Collecting Agency of Chicago. This agency used in its business

an envelope, with these words printed on it in the left-hand upper corner: "Bad Debt Collecting Agency, 218 La Salle street, Chicago." Upon the receipt of this account, they opened a correspondence with Mrs. Vincil. It appears that she received four communications in envelopes like this in regard to this debt. The envelope described in the information was the fourth of the series that she received. She testified that at the time she received the first she was working at Scruggs, Vander-voort & Barney's; that a large number of employes were in the house; that their mail was put in a common repository, and distributed out of a common box; that different ones saw this letter, and the superscription on it. She was so mortified at this that she went to the post-office, and directed her mail sent to her residence. Her relations saw the other three letters she received. When she received the first letter, she wrote, on the thirtieth of January, 18.8, to Armstrong, the defendant:

"*Dear Sir :*—I received the inclosed from some association in Chicago. How dare you do such a thing? I have never refused to pay a just debt, but I do most emphatically refuse to pay them twice. My word is as good as Mr. K.'s, and I say again I have paid this bill —a part at one time, and the balance on leaving Mexico. I have a statement of $5.85 from Mr. K. If he remembers a part of it being settled, how is it I am still charged with the full amount? I do not propose, with all my present grief and troubles, to be persecuted and annoyed further by you. There is a limit to all things. It is as much as I can possibly do to support myself and child; and now, that my father is dead, I will also have to contribute to my mother's support. This double method on your part to collect this bill twice is out-rageous, more especially as it is against a woman who has no other resources but her own exertions to main-tain herself and child. It is unworthy of a man. I will not submit to further insult. You will drop this at

once, and withdraw my name, as you have no right to use it in such a manner.    If you continue this it will be at your cost.

"[Signed]                    MRS. M. B. VINCIL,
"No. 2, N. Beaumont Street."

On the bottom of that is the answer to that.

"2–1, 1888."

(The court:    "Did the letter that you wrote to the defendant come back to you with this lead pencil memorandum at the bottom of it?    It did."    Mr. Goode, continuing to read:)

"We differ in opinion on this account.    When paid I will stop the agency, and would advise you to pay it at once, and avoid further trouble.    Respectfully,

"A. G. ARMSTRONG."

She received this letter from defendant; written, as the other one was, on the letter-head of Kabrich & Co., dated the fourteenth of February, and is as follows:
"*Mrs. Marg Vincil, St. Louis, Mo.*

"MISS MARY:—I received your letter 2–11, and contents noted.    Herewith inclosed find your account. On receipt of $5 I will stop Sprague's Collecting Agency. Hoping this to meet with your approval, etc.

"Most respectfully,
"A. G. ARMSTRONG."

To this is attached a bill, dated "February 15, 1888, Mexico, Missouri," showing indebtedness, $6.70; credit by cash, $3; leaving due $3.70; interest on above $1.30; making a total of $5.

"The above is correct, according to your own buying and paying when in Mexico, Missouri.

"Yours, respectfully,
"[Signed]       G. KABRICH & J. B. SNYDER."

There seems to be no question but that this account was barred by the five-years limitation.    Mrs. Vincil had been a resident of the state all the time.    Kabrich, one of the firm, testified there were two small errors in the account; that the balance due in 1881 was $3.45;

that, with interest, it amounted to $5. He denied that she had ever paid this balance. She testified that she paid it when she left Mexico, to live in St. Louis. Among other witnesses, Mr. Bassford, editor of the *Ledger*, a newspaper published in Mexico, testified that, when he heard Armstrong was to be prosecuted for libel, he "interviewed" him concerning the matter. He went into his store, and asked him to tell him something about it, and read him an article that had been printed in the St. Louis *Evening Chronicle* the day before. Defendant said it was "pretty rough, proceeded to explain the matter to me, how he had dunned Mrs. Vincil. Mr. Armstrong stated that this lady, Mrs. Vincil, had owed the firm a bill for a long time, of which she had been repeatedly sent a statement, and that didn't avail very much, and so he sent one registered—sent a registered letter—in care of Scruggs, Vandervoort & Barney, for whom the lady was working. That letter was received, but there was no money forthcoming. He said he was a member of Sprague's Collecting Agency of Chicago, and he sat down and filled out a blank supplied by this concern, and sent it to Mrs. Vincil. About that time—I don't know whether it was at that stage of the talk or not—he showed me one of those blanks I have spoken of. After he sent the blank, no money came, he said, and he resolved to place the matter in the hands of this agency of Chicago, which he said he did. A short time after having placed it in the hands of the agency in Chicago, he received a letter from Mrs. Vincil. He described it as being a stinging one of several pages, in which she denied the debt. He said the debt was just, and the book showed it to be unpaid. He said he wanted the money. This was the substance of the interview." Defendant also stated to the witness that he thought from the tone of Mrs. Vincil's letter, she had received "a chromo;" that is, he described it as being a large envelope, covered with heavy, black letters containing the sentence "Bad

Debt" or "Dead Beat" "Collecting Agency," and so, forth.

On the part of the defendant it was shown that Mrs. Vincil had not paid $3.45 of the account; also evidence, tending to impeach or deny Mr. Bassford's account of his conversation with defendant; also offers to prove she owed several other small bills in Mexico, which were refused by the court. Defendant testified in his own behalf that Mrs. Vincil owed his firm a book account of $5, and he desired to collect it. He mailed her a card as follows:

"MEXICO MISSOURI [giving the month], 1888.

"*Mrs. Vincil:* Your bill, amounting to $5, is past due. Please call and make a settlement inside of ten days. The principal merchants and leading professions of the West have organized a protective union. I have become a member of the union. Every member is required to report all persons who owe bills that are past due. Please do not compel us to report your name.

"Respectfully,

"A. G. ARMSTRONG.'

The heading to this card read as follows: "P. H. Sprague, President. A. H. Wilson, Manager. T. W. Sprague, Secretary & Treasurer. Sprague's Collecting Agency, formerly Western Merchants' Retail Protective Union." Defendant denied that he ever mailed a letter to Mrs. Vincil in one of the "Bad Debt" envelopes; denied knowing that the agency was using this form of envelope in writing to her until this prosecution commenced; and that he did not instruct or cause the agency to use this envelope. Whereupon the court gave the jury the following instructions:

"1. The jury are instructed that if they believe from the evidence that the defendant, on or about the twenty-seventh day of March, 1888, caused the envelope given in evidence to be sent to Mary Vincil, in the city of St. Louis, through the mails, wilfully and

maliciously intending and meaning to indicate to the public, and to all persons seeing said envelope, that she, the said Mary Vincil, was dishonest, or did not pay her just debts, or that she had been guilty of unfair dealing, or was a 'dead beat,' and that said envelope was so understood by those persons who saw it; and if the jury further believe that the reception through the mails of such envelope containing the inclosure set out in said information tended to provoke the said Mary Vincil to wrath, and to expose her to public hatred, contempt and ridicule, and to deprive her of the benefit of public confidence and social intercourse; and if the jury further believe that said defendant wilfully and maliciously intended by said acts to advertise said Mary Vincil as a dead beat, or as dishonest,—then the jury will find the defendant guilty, unless they further find that said Mary Vincil is a dead beat, and is dishonest, and unfit to be trusted, and unfit for public confidence.

"2. The jury are instructed that malice is the wilful doing of a wrongful act without just cause or excuse; and they may infer malice from the facts, if they believe it to be the natural inference to be drawn from them.

"3. The previous good character of the defendant, if established, is a fact in this case which the jury ought to consider in passing upon his guilt or innocence of this charge.

"4. But if all the evidence in the case, including that given touching the previous good character of the defendant, shows him to be guilty, then his previous good character cannot justify or excuse the offense.

"5. The defendant is a competent witness in his own behalf; but the fact that he is a witness testifying in his own behalf, and the interest he has at stake in this case, may be considered by the jury in determining the credibility of his testimony.

"6. The jury are the exclusive judges of the credibility of the witnesses. With that the court has

The State v. Armstrong.

nothing to do. And if you believe and find from the evidence that any witness has wilfully testified falsely to any material fact in the case, you are at liberty to disregard the whole or any portion of such witness' testimony.

"7. The law presumes the defendant to be innocent, and this presumption continues, until it has been overcome by proof which establishes his guilt to your satisfaction and beyond a reasonable doubt; and the burden of proving his guilt rests with the state. If, however, this presumption has been overcome by the evidence, and the guilt of the defendant established to a moral certainty, and beyond a reasonable doubt, your duty is to convict. If, of his guilt, you are not convinced beyond a reasonable doubt, your duty is to acquit. But, to justify an acquittal on the ground of doubt alone, it should be reasonable and substantial, and not a mere guess or conjecture of the possibility of innocence.

"8. The jury are further instructed that, if defendant caused said envelope to be sent through the mails, directed to the said Mary Vincil at the city of St. Louis, then such acts constitute a publication of the libel in said city.

"9. If the jury find the defendant guilty, they may assess his punishment at imprisonment in the city jail for a term not exceeding one year, or by a fine not exceeding $1,000, or by both such fine and imprisonment.

"10. The jury are instructed that the only meaning that they can put upon the words 'bad debt' upon said envelope is the usual and ordinary meaning attached to them as used in the English language; and they are not to place the meaning and meanings alleged by way of innuendo in the information, unless they find that the words 'bad debt' and the said meaning and meanings so alleged by way of innuendo are the true meanings and sense of the said words 'bad debt.'

"11. The court instructs the jury that the mere fact, that the defendant Armstrong may have been a subscriber to or employer of the Sprague Collecting Agency of Chicago, will not render him liable for their criminal acts ; and that said defendant is not responsible for the sending or publishing of the alleged libelous matter, unless such was done by him or upon his direction and instruction.

"12. The court instructs the jury that an indebtedness by open account is a valid and legal debt, although of more than five years' existence.

"13. The court instructs the jury that before the jury can convict they must find and believe beyond a reasonable doubt that the prints alleged and set forth in the information herein were of a libelous nature, and had the effect of charging the aforesaid Mary Vincil with being dishonest and guilty of unfair dealing ; and that, further, said prints were sent to the said Mary Vincil by the defendant or by some one at his instance and request ; and, further, that the inference to be drawn from the prints of ' bad debt,' etc., on the alleged envelope, were, as a matter of fact, untrue.

"14. The jury are instructed that they are the sole judges of the weight of the evidence and the credibility of the witnesses, and it is for them to find from the evidence in this case whether there was any intention on the part of the defendant, in the use of the means employed to collect a debt, to libel the prosecuting witness, Mary Vincil ; and, if they find there was no such intention, then they will return a verdict of not guilty.

"15. The court instructs the jury that under the constitution of Missouri and the statutes thereof the jury are themselves the judges of the law of libel, as well as of the facts, and that they are not required to accept the instructions given by the court as being conclusive of what the law of criminal libel is."

To the giving of which said instructions the defendant excepted, and saved his exceptions at the time.

Refused instructions: And the defendant asked the following instructions: "1. The court instructs the jury at the close of all the testimony that, under the evidence in this case, they must acquit the defendant. The court instructs the jury that they cannot construe the words 'bad debt' as meaning that one is a 'dead beat,' or that one 'has been guilty of unfair dealings,' or 'is dishonest;' and that the jury should disregard so much of the innuendo of the information in this case as charges such to be the meaning of said words 'bad debt.'

"2. The court instructs the jury that there is no evidence in regard to the receipt by Mary Vincil of the letter set forth in the information, and purporting to come from the Sprague Collecting Agency of Chicago, nor publication of said letter in the city of St. Louis, and the jury should disregard said letter, and that portion of the information in reference to the same, and all charges of libel based on the same. The court instructs the jury that the law presumes the defendant to be innocent of the crime alleged in the information; and that, before the jury can find the defendant guilty in this case, the state must prove to the jury beyond a reasonable doubt that the defendant at the city of St. Louis, on or about the twenty-seventh day of March, 1888, did unlawfully and maliciously mail to the said Mary Vincil, or that the defendant, at the city of St. Louis, on or about the twenty-seventh day of March, 1888, did unlawfully, wilfully and maliciously cause to be mailed to the said Mary Vincil the said envelope shown in evidence, and that by so doing he, the defendant, intended thereby to commit the offense of criminal libel; and, before the jury can find that the defendant did cause the mailing of said envelope to be done, the state must prove beyond a reasonable doubt that the defendant directed the said Sprague Collecting Agency

to direct and mail the said envelope with the words
'bad debt' thereon ; and the state must further prove
to the jury beyond a reasonable doubt that the said
Mary Vincil does not owe the debt claimed by defend-
ant ; and, unless the state has proven all of these things
to the jury beyond a reasonable doubt, then the jury
will return a verdict of not guilty.

"3. The jury are instructed that if they believe
from the evidence in this case that the said Mary Vincil
owes the debt referred to in the correspondence put in
evidence in this cause between her and the defendant,
that it is their sworn duty to return into court a verdict
of not guilty, although the jury may find that said
debt is barred by the statute of limitations of five
years.

"4. The jury are instructed that, although they
may find that the words 'bad debt,' as used upon said
envelope, are libelous, still, before they can find the
defendant guilty, they must further find that the
defendant directed the composing of and publishing of
said libelous matter, and this fact must be proven to
the jury by the state beyond a reasonable doubt.

"5. The court instructs the jury that evidence of
good character is competent in favor of a person accused
and on trial, as tending to show that he would not com-
mit the offense alleged against him ; and, if in this case
the jury believe from the evidence in this case that the
defendant has always borne a good character for truth
and honesty and quietude among his acquaintances and
in the neighborhood where he lived, then this is a fact
proper to be considered by the jury in arriving at a ver-
dict ; and if, after a careful consideration of all the
evidence in the case, including that bearing on his
character, the jury entertain any reasonable doubt of
the defendant's guilt, then it is their sworn duty to
acquit him.

"6. The jury are instructed that they will reject
and not consider any meaning placed upon the words,

'bad debt' upon said envelope, except the usual and ordinary meaning attached to them in the English language.

"7. The court instructs the jury that, although they may believe and find from the evidence that the defendant Armstrong placed an account against Mrs. Vincil in the hands of the Sprague Collecting Agency, of Chicago, for collecting, and that he may, at the time of doing so, have been aware of the methods used by said agency in attempting to make collections, yet the defendant cannot be held responsible for any acts of said agency in sending the alleged prints and writings, unless they were sent at the instance and request of the defendant."

Which the court refused, to which refusal of the court the defendant excepted, and saved his exceptions at the time.

After argument of counsel, the jury returned into court the following verdict:

"State of Missouri, )
               v.       } Charged with criminal libel.
"A. G. Armstrong.  )

"We, the jury in the above-entitled cause, find the defendant guilty as charged in the information, and assess his punishment at a fine of $500.

"THOS. D. FORD,
"Foreman."

*George Robertson* for appellant.

(1) The information filed in this cause is insufficient. *First.* The verification by the complainant is not good. *State v. Bennett,* 102 Mo. 356. *Second.* It is obnoxious because it has united in one count more than one offense, *first,* it attempts to charge libel as to the envelope, *second,* as to the contents of the envelope, the letter; *third,* an attempt to blackmail, and, *fourth,* sending a threatening letter. Each one of these offenses

is as definitely charged as the other, and for this reason the judgment should have been arrested. *State v. Green*, 24 Mo. App. 227. *Third*. The information fails to charge an offense against the laws of the state. It does not charge that the defendant did cause the matter complained of to be published "wilfully" or "knowingly," or that he did "knowingly" or "wilfully" publish, etc. R. S. 1889, secs. 3869, 3870, 3871. Nor does the information charge the offense in the language of the statute, or substantially in its language. *Fourth*. The information is further defective because it does not contain the written allegations of the libelous matter complained of. The envelope and the letter are pasted into the information, and their contents not written in. This fact prevents it from being an information. The indictment or information must consist of written allegations which stand instead of the manual presence of the thing in controversy. 1 Bishop on Crim. Proc., sec. 319. Were this method of pleading in criminal cases to prove the rule, it would be very inconvenient for the officer in cases of larceny to always be able to insert in the indictment the article stolen instead of the name of the article. The case should be reversed, and dismissed for the foregoing reasons. (2) The court should have sustained the defendant's demurrer to the state's evidence, as it did not appear from the evidence that the defendant knowingly or wilfully caused the matter to be published. He simply employed this agency to do some collecting and the agency used its own methods. Sending the libelous matter, if it be such, was not within the scope of its employment. Townsend on Slander and Libel [4 Ed.] 104, note ; *Harding v. Greening*, 1 Moore, 477 ; 1 Holt, N. P. 531 ; *Hardin v. Cumstock*, 2 A. K. Marsh. 480. It does appear from the evidence of the defendant that he had no knowledge of the kind of envelopes and letters used by the agency till after this prosecution was begun. After

The State v. Armstrong.

this evidence was developed on the part of the defend-
ant, the court should have given defendant's refused
instruction, numbered 1, to acquit. (3) It was error
to permit the state to read the envelope and letter to the
jury in evidence, because they were part of the plead-
ings and the information is not evidence in the case.
Were the indictment evidence in the case it would be
sufficient for the prosecution to read the indictment and
demand a conviction. See the distinction between the
terms evidence and pleadings. 1 Bishop's Crim. Proc.,
chap. 1, and Anderson's Law Dict. (4) The admission
in evidence of the letter written by the complainant to
defendant is error. The proper reason was given at
the time for excluding this letter. (5) It was error in
the court to exclude the evidence offered by the defend-
ant in cross-examination to show that the complainant
owed numerous other debts that she had failed to pay.
Also the evidence of the witnesses, Reed, Harding,
Emmons and Bedell. If the words "bad debt," and
other language used in the information, mean that she
was poor pay, did not pay her honest debts, etc., then
this evidence excluded proved the truth of the alleged
libel. In prosecutions for libel the truth thereof may
be given in evidence. Const. of Mo., art. 2, sec. 14;
R. S. 1889, sec. 3872; R. S. 1879, sec. 1594; *State v. Hos-
mer*, 85 Mo 553. (6) Instruction, numbered 1, given by
the court, is erroneous, for the reason, *first*, that there
was no evidence in the case that defendant caused the
envelope to be sent to the complainant; *second*, it does
not incorporate therein any true conception of the law of
libel; *third*, it assumes that the words on the envelope
meant the defendant was dishonest, a "dead beat," etc.;
*fourth*, it leaves to the jury to decide the effect of the
reception of the letters and envelope upon the complain-
ant. Whether the reception of the envelope, etc.,
tended to provoke to wrath, expose to public hatred,
etc., are not questions for the jury; they are questions
of law for the court; then if they have such effect,

necessarily, they are libelous. (7) Instruction, numbered 15, given by the court, is erroneous. *State v. Hosmer*, 85 Mo. 553. Were this instruction not error, then it was error in the court to give all the other instructions given in the case. (8) Defendant's instruction, refused by the court, was a true application of the law of libel to the facts of this case, and should have been given. (9) The constitution of this state guarantees that no one shall be deprived of liberty or property without due process of law.

*John M. Wood*, Attorney General, and *Charles M. Napton* for the State.

(1) The verification is sufficient, nor is the objection well taken that the information charges several offenses. (2) It is no ground of objection that the libelous matter itself was pasted on the information and made a part thereof. The defendant having generously supplied the prosecutrix with four such missives, and as the libel was somewhat in the nature of an effigy, it does not lie in defendant's mouth to complain that one of the envelopes and its contents were used to form the information. (3) The court, after giving a general instruction covering the general principles of law applicable to libel cases, declared: "That the jury are themselves the judges of the law of libel, as well as of the facts, and they are not required to accept the instructions given by the court as being conclusive of what the law of criminal libel is." The foregoing instruction is a correct exposition of the law. Odgers' Libel and Slander, side p. 585; Fox's Libel Act, 32 George III. C. 60. The question involved here was not sufficiently presented or considered in *State v. Hosmer*, 85 Mo. 553. (4) The evidence offered by defendant to prove that the prosecutrix owed several debts in Mexico, Missouri, was rightly excluded. Townsend on Libel and Slander, sec. 213, pp. 318-9.

GANTT, P. J.—The appellant contends that various errors were committed in this trial, and they will be noticed in the order in which he complains. His first assignment is the insufficiency of the information. The verification is claimed to be bad, because the prosecutrix only swore that the facts stated were "true to her best knowledge and belief." This was ruled otherwise in the recent decision of this court in *State v. Bennett*, 102 Mo. 356. It is next said that the information is bad for duplicity. This objection is raised for the first time in the motion in arrest. There are various methods for taking advantage of duplicity in an indictment or information. A motion to quash, a demurrer, or motion to compel the state to elect, will, either of them, correct this fault; but it is almost universally held that it is too late after verdict to make this objection in a motion in arrest in a misdemeanor. 1 Bish. Crim. Proc., secs. 442, 443; *Commonwealth v. Tuck,* 20 Pick. 356; Whart. Crim. Pl., secs. 255, 760. The cause was heard on the charge of libel, the evidence confined to that offense, and the instructions all had reference to that misdemeanor. We cannot see that any substantial right of the defendant was violated in this respect in overruling the motion in arrest. The matter complained of was at most mere surplusage, and this defect, if any, was cured by our statute of jeofails. Sec. 4115, or R. S. 1879, sec. 1821.

Equally groundless is the objection that the information did not "charge the matter complained of was "wilfully" or maliciously" published. It distinctly alleges that defendant "did wilfully and maliciously libel and defame the prosecuting witness by sending the said envelope with its indorsements through the mails," etc., and is sufficient, according to the most approved precedents. The defendant was fully informed by it of the nature and character of the offense with which he was charged, and, after all, this is the great object of an information or indictment.

It is next urged against this information that it does not contain the written allegations of the libelous matter complained of. Anyone reading the information in this cause would be at a loss to understand this objection. As a matter of fact, the point made in argument was not that it was not in writing, but it was not written by the prosecuting attorney at the time the remainder of the information was drawn, but the original envelope, or at least that portion containing the alleged libel, was pasted in the information, and made a part thereof. Learned counsel for defendant seem to think that it was very material who did the writing. This point is entirely too technical to be seriously entertained in a court of justice. Besides these specific objections, there is a general assignment of error that the information does not charge an offense under the statute. This information is drawn under section 3869, Revised Statutes, 1889 ( R. S. 1879, sec. 1591 ), which defines a libel as follows : " A libel is the malicious defamation of a person, made public by any printing, writing, sign, picture, representation or effigy, tending to provoke him to wrath, or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse ; or any malicious defamation, made public as aforesaid, designed to blacken and vilify the memory of one who is dead, and tending to scandalize or provoke his surviving relatives and friends."

Was the sending of this envelope with these indorsements on it the publishing of a libel, tending to expose the prosecutrix to contempt or ridicule, and bring her in disrepute with her employers and the public? We are clearly of the opinion that it was. The words " Bad Debt Collecting Agency " were printed in large, bold type on the envelopes, and were obviously intended to attract the attention of the public? These words must be construed in the light of the times in which they are used. Similar associations had sprung up all over the

country, and these devices were resorted to to force debtors to pay their debts. To such extent did they go that the congress of the United States forbade the use of the mails for their distribution. They had become so common that they were thoroughly understood in the mercantile world. Under this state of affairs, the defendant resorts to this Chicago agency to collect this debt of the prosecutrix. He sets in motion this machine for extorting this money from her. It was known that the prosecutrix was earning her living by her work in the large and responsible dry-goods house of Scruggs, Vandervoort & Barney. Accordingly, these letters, four in number, are directed to her in the care of her employers. All the mail for the employes of this large house was put together and taken by the carriers to the store. There the various clerks went to a common repository for their mail. So that the scheme was well devised to attract the attention of those with whom she was most intimately connected, and without whose respect and good opinion the life of a sensitive woman would soon become a burden and unendurable. This envelope on its face was designed to attract the attention of the public, and when the prosecutrix received these letters in these envelopes the fact was thereby published that this association was in correspondence with her for the purpose of collecting a bad debt; and we cannot shut our eyes to the necessary implication that she was a bad debtor; that she was not in the habit of paying her honest debts; and was unworthy of credit. Nor are we left in doubt that this was the purpose of the association. In the letter which came under cover of this envelope the agency asks her: "Can you afford to have the public know that you refuse to pay this bill? You may need credit again some time, but as long as this account remains in this unsatisfactory manner it will be hard for you to obtain it." In other words: "By means of this style of publishing you to the world we will advertise you as unworthy of credit."

Nor was this all. She is warned: "Should you positively refuse to make any arrangements for a liquidation of this claim, we feel justified in advertising the same for sale in the newspapers, as well as to send you a statement regularly until the matter is settled." These regular communications, if sent without these libelous words in large type, would not attract any attention; but, received regularly in this form, would give a painful publicity.

The evident purpose and design of the defendant and the association he employed, and for whose acts he is responsible in this matter, was to publish the prosecutrix as a bad debtor, a dishonest person, who would not pay her honest debts, and to degrade her in the eyes of the public and her employers, and as such was clearly libelous, and within the meaning of the statute. *Muetze v. Tuteur*, 46 N. W. Rep. (Wis.)123; *Dennis v. Johnson*, 44 N. W. Rep. (Minn.) 68; *Johnson v. Commonwealth*, 14 Atl. Rep. 425. The law will not countenance or tolerate this method of collecting a debt. The facts that the debt was originally only $3.45; that it was barred by the statute of limitations; that defendant persisted in his endeavor to extort the money from the prosecutrix after her protest; and the avowed invention of his agents to publish her to the world, and advertise this account for sale in the newspapers, amply sustain the charge that this was maliciously done. To permit a defenseless woman in this day of enlightenment to be thus persecuted would be a reproach to our laws. *Beals v. Thompson*, 21 N. E. Rep. 959.

It is insisted by defendant that the court ought to have sustained a demurrer to the evidence. The defendant's own letters of February 1 and 14, 1888, both show that he was aware that this agency was sending to Mrs. Vincil letters that she regarded as insulting. She had appealed to him to call off this agency, and he complacently informs her he will, when she sends the $5. "*Qui facit per alium, facit per se*," and this

maxim applies in all its strictness in libel. Besides, Bassford, the editor of the *Ledger*, testified that the defendant told him he was a member of the Sprague Agency, and in referring to Mrs. Vincil's letter he said he thought she had received a "chromo," to which he alluded. After believing or thinking that she had received this style of a letter from his agents or associates in Chicago, he declined to stop them unless she pays the $5. There was ample evidence to sustain the verdict of the jury as to his knowledge and complicity in originating and publishing the libelous envelope. The pasting of the portion of the envelope containing the libelous matter in the information so as to make it a component part thereof was unusual, and, we think, wholly unnecessary; but it certainly did not and could not destroy its character as original evidence in the case; hence, the trial court committed no error in admitting it as evidence.

There was no error in admitting the letter of January 30, 1888, in evidence. It was admissible to show defendant's knowledge of the means his agency was pursuing in his behalf, and of the claim that the debt was paid; and his reply, written on the letter itself, shows his determination to persist, notwithstanding the protest of Mrs. Vincil.

Nor did the court err in excluding the evidence of Reed, Emmons, Bedell and Mrs. Harding, tending to prove that Mrs. Vincil owed them altogether some $18.50. No offer was made to prove her general reputation in regard to paying her just debts. She was not expected, nor was the state required, to come prepared to meet and try every individual claim that might be made against her. Evidence of specific indebtedness was not admissible. *Wilson v. Noonan*, 27 Wis. 598; *Campbell v. Campbell*, 54 Wis. 90; *Muetze v. Tuteur*, 46 N.W. Rep. (Wis.) 123. Indeed, the fact that, after the zealous efforts of defendant to destroy her character as an honest woman, he could only find an indebtedness of

$18.50 against her in a community where she had lived for many years, is rather a vindication. It is questionable, if admitted, if it would have had any appreciable effect upon any sensible juror.

The point made, that the court permitted the state's counsel to cross-examine the defendant on matter not elicited by his counsel in chief, has been carefully examined, and we have concluded that it really amounts to nothing more than an inquiry if he understood what Mrs. Vincil referred to as insulting in her letter of January 30. No possible injury could come from this. The court expressly ruled the counsel for the state to a cross-examination of the matter brought out by defendant, and none other was elicited.

The instructions correctly told the jury what was necessary to constitute the libel under the information. The only one requiring special examination is the fifteenth which informs the jury that they are the judges of the law of libel as well as of the facts, and they were not required to accept the instructions given by the court as being conclusive of what the law of criminal libel is. Section 14 of article 2 of the constitution of Missouri declares "that no law shall be passed impairing the freedom of speech ; that every person shall be free to say, write or publish whatever he will on any subject, being responsible for all abuse of that liberty ; and that in all suits and prosecutions for libel the truth thereof may be given in evidence, *and the jury, under the direction of the court, shall determine the law and the fact.*" It was to this constitutional provision in our bill of rights, this instruction referred. In *State v. Hosmer*, 85 Mo. 553, Judge HENRY, in discussing an instruction similar to the one complained of here, says : "The defendant asked the court to declare the law to be 'that under the law the jury are to determine the law and the facts in this case.' Section 1594, Revised Statutes, 1879, is as follows : 'In all prosecutions for libel or verbal slander the truth thereof may be given in evidence to the jury, and shall

constitute a complete defense ; and the jury, under the direction of the court, shall determine the law and the fact.'. I confess that I do not fully comprehend the meaning of the remarkable concluding clause of that section ;" and he condemns that instruction. No allusion is made by the learned judge to the bill of rights, nor to the history of this provision in our constitution and law. Section 14, article 2, of our constitution is but a rescript of section 1, Fox's Libel Act enacted by the British parliament ( 32 Geo. III. ) in 1792. Before that act it had become to be the rule that the judge, not the jury, should decide whether or not the publication was a libel. The judge would direct the jury to find the defendant guilty on proof of the publication of the innuendoes, and of the other necessary averments. But that act declared and enacted that on the trial of an indictment or information for libel the jury may give a general verdict of guilty or not guilty upon the whole matter put in issue before them. This act in full will be found in Odgers on Libel and Slander, page 665. In the case of *Queen v. Sullivan*, for seditious libel, in 1868, this law was interpreted by FITZGERALD, Judge, who presided in the trial. It is reported in 11 Cox Crim. Law Cases, 51. Among other things, in his charge to the jury, he said : " The next question is of paramount importance, and it is the one of which the jury are the sole judges, whether these publications are seditious libels ? That question of law and fact is intrusted to the jury alone. I know that some of you have considerable experience as jurors, and I have often had the duty cast upon me of addressing you as such. You must have observed that in ordinary cases, especially in the crown courts, the questions were divided into those of law and fact. The questions of law are usually for the judge, and on them the jury are bound to take his direction. The questions of fact are solely for their determination. In this peculiar case of libel the law of the land says the jury shall determine the whole question whether the

publication is a libel or a seditious libel. That power has been given to the jury for the purpose of protecting the inviolable blessing of a free and independent press. You should bear in mind that, while you will receive assistance from me, you are not bound to follow anything I tell you. You are the sole judges of law and fact."

In *Rex v. Burdett*, 4 Barn. & Ald. 131, Mr. Justice BEST said : " Libel is a question of law, and the judge is the judge of the law, in libel as in all other cases. The jury having the power of acting agreeably to his statement of the law or not." When we remember the origin of this provision in our constitution, that it was the result of the speech made by Lord ERSKINE, in his defense of the Dean of Asaph in 1784, a speech declared by Fox to be the finest argument in the English language, and that this speech prepared the way for the adoption of Fox's libel bill in 1792, it is impossible for us to view it as having no other or different meaning than the other provisions guaranteeing a "jury trial. Does not the usual construction apply here, as in other cases,—that, when foreign laws are adopted, and made a part of our code, the presumption is that we adopt also the construction already given by the foreign courts where they had their origin ? As we have seen, the English courts make a broad distinction in prosecutions for criminal libel and all other cases as to the province of court and jury. The scope of this opinion forbids any further elaboration of the great principles upon which this provision is founded. The argument of Lord ERSKINE on the right of juries in criminal libel is in itself a complete history, and will be found reported in full in 21 How. State Trials, 847–1046. Viewed in the light of the history of the constitutional provision, and the great contest for the freedom of the press out of which it grew, and of the construction given Fox's libel bill by the English judges, did the criminal court err, after it had fully instructed the jury in this cause,

The State v. Armstrong.

in further instructing them that they were themselves the judges of the law of libel, as well as of the facts, and that they were not required to accept the instructions given by the court as conclusive of the law of criminal libel? Is not this instruction, in substance and effect, just what the constitution commands, and is it not simply another way of stating the same principles that were announced by Judge FITZGERALD in the *Sullivan case, supra,* and Justice BEST in *Rex v. Burdett, supra,* viz. : That, while the judge may assist and inform them what the law is, and it is his duty to do so, still they are, by virtue of organic law, the final judges in a prosecution for criminal libel? We think so ; and in so doing we conclude that the decision in *State v. Hosmer, supra,* was decided without this constitutional provision, and its history having been brought to the attention of this court, and inasmuch as it is of the very gravest importance that the constitution itself should govern, we think *State v. Hosmer* should not longer be followed.

This brings us to the conclusion that there are no reversible errors in the record in this cause, and the judgment of the criminal court is accordingly affirmed. THOMAS, J., concurs; MACFARLANE, J., not sitting.