## MARY RAIL, Appellant, v. THE NATIONAL NEWSPAPER ASSOCIATION, Respondent.

### Kansas City Court of Appeals, December 22, 1916.

1. **LIBEL AND SLANDER**: Instructions: Power of Trial Court: Law and Fact. In an action for libel the jury are the judges of both the law and fact, but it is the function of the trial judge to give instructions as in other cases, except that in libel cases the instructions are merely advisory, and if the pleadings and evidence fail to disclose a cause of action the court has the power to direct the jury to return a verdict for the defendant.

2. ———: Innuendo. The office of the *innuendo* in libel and slander cases is to set a meaning upon words or language of doubtful or ambiguous import which alone would not be actionable.

3. ———: Definition of Libel. Libel is defined by statute (Section 4818, R. S. 1909) to be the malicious defamation of a person made public by any printing, writing, sign, picture, representation or effigy tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse.

4. ———: Defamatory Words. Words are libelous *per se* which within themselves necessarily carry a defamatory meaning and are not libelous *per se* if they are susceptible of a reasonable interpretation which excludes a defamatory imputation.

5. ———: ———: Falsity Thereof: Evidence. The falsity of all defamatory words is presumed in the plaintiff's favor and he need give no evidence to show them false. The burden is on defendant to rebut this presumption by evidence in support of the plea of justification.

6. ———: Express Malice: Evidence. When slanderous words are spoken, or a libelous article is published falsely the law will affix malice to them, there being no necessity to offer proof of express malice.

Appeal from Jackson Circuit Court.—*Hon. James H. Slover,* Judge.

REVERSED AND REMANDED (*with directions*).

*Hadley, Cooper & Neel* and *W. W. Bryant* for appellant.

*Frank M. Lowe* for respondent.

JOHNSON, J.—This is an action for libel against the proprietor of the Kansas City Post, a newspaper of general circulation published at Kansas City. The jury returned a verdict for plaintiff for $500 actual and $1000 punitive damages, but the court sustained defendant's motion for a new trial "on account of errors in plaintiff's instructions," and plaintiff appealed.

The petition alleges that on August 24, 1910, defendant published of and concerning plaintiff the following false and defamatory article:

"BABY FARM IS FOUND IN APARTMENT HOUSE: TWO ARRESTED; ONE BABY DIES."

"Mary Rail and Dr. Joel McDaniel held under $500 bond. Woman well known to police (meaning to charge and the readers of said article so published by defendant, as aforesaid, understood defendant to charge, and the defendant meant that the readers of said articles should understand the same to charge that this plaintiff, by reason of frequent and numerous violations of the law, has become and is well known to the police) formerly ran home for babies on the west side.

"Bodies of six infants found in Kansas City sewers recently. Unable to tell the police history of any child in her charge; woman denies responsibility for death of children; one baby dead; another dying at St. Anthony's Home.

"Pursuing their investigations into the finding of six dead babies within the last few months in sewers in the neighborhood of Thirteenth and Fourteenth and

Harrison Streets, the police last night went into the apartments of Mrs. Mary Rail, alias Miss Chardis Lundin'' (meaning to charge and the readers of said article so published by defendant, understood defendant to charge that this plaintiff has, in common with professional criminals, more than one name, designated as an "alias") "at 1515 Harrison Street." (Meaning to charge and being understood by the readers of said article, to charge, that the plaintiff is guilty of divers crimes, to-wit, the killing of six infants and has disposed of the bodies of said infants by placing them in sewers in her, plaintiff's immediate neighborhood.) "They found four babies, all in sickly condition, one dies this morning and another is dying at St. Anthony's Home, Twenty-third Street and College Avenue. The other two babies probably will not live." (Meaning to charge, and being understood by the readers of the said article, to charge that plaintiff was responsible for the alleged sickly condition of the last-mentioned four babies; that the plaintiff was responsible for the alleged death aforesaid of one of the above-named four babies; that plaintiff was responsible for the alleged dying condition of the baby aforesaid in St. Anthony's Home; that the plaintiff was responsible for the alleged condition of the other two babies of the above-named four, which alleged condition pointed to the certain death of said two babies.)

"Mrs. Rail and Dr. Joel McDaniel, 211 East Twelfth Street, were arrested by Detectives Zickefoose and Farrell. They were arraigned in the municipal court this morning on charges of violating the city ordinance governing the birth, death and adoption of infants."

### "NEIGHBORHOOD IS SURPRISED."

"The case was continued until next Tuesday morning, to allow the defendants to get some witnesses. The two were released on $500 bond each.

"The raid and the arrests bewildered others who live in the three-story apartment house on Harrison

Street.   Although several families lived there, no person knew there had ever been a baby in the rooms of Mrs. Rail until the detectives carried the infants out last night to send them to St. Anthony's Home.'' (Meaning to charge and the readers of said articles so published by the defendant, as aforesaid, understood the defendant to charge, and the defendant meant that the readers of said article should understand the same to charge that plaintiff had the said babies in her charge, intending to murder them, and, that on account of said felonious intention, the presence of the four babies aforesaid in her apartment was kept a profound secret.)

"In explanation of the four babies there, Mrs. Rail said she was nursing them and trying to find good homes for them at the recommendation of Dr. McDaniel. The physician said most of the babies taken to the woman's place came from 2111 East Seventh Street, an institute. He said that the mothers of the children had asked him to find good homes for their little ones and that he sometimes put babies in charge of Mrs. Rail.''

## "DENIES KNOWLEDGE OF OTHERS FOUND DEAD.''

"When questioned about the bodies of the six babies taken from the sewers in that neighborhood during the last few months, the woman (meaning this plaintiff) said she knew nothing about them.   She refused to tell the officers of any person with whom she had found homes for the little ones left in her care.'' (Meaning to charge and being understood by the readers of said article to charge, that said six babies alleged to have been found in sewers aforesaid, were received by the plaintiff, murdered, and their bodies cast into the sewers in the vicinity of her home.)   "She would not give the history of any particular baby—where she got it, what she did with it, who was its mother or who had adopted it.   Nothing that she said served to clear up the mystery which the police have been working upon for many months.'' (Meaning to charge, and

being understood by the readers of said article, to charge that plaintiff had received the said six babies for the purpose of murdering them.)

"Of the four babies taken from the Rail establishment last night and removed to St. Anthony's home one died this morning from a disease having the appearance of yellow jaundice, another is covered with sores, and apparently has not long to live, and the other two are sickly."

"Mrs. Rail told detective Zickefoose last night that the babies came from 2111 East Seventh Street. One, she said was born yesterday, two Sunday and one Saturday."

## "BABIES MORE THAN A WEEK OLD."

"Dr. W. L. Gist of the emergency hospital, who examined the infants last night, said that one was fully three weeks old and that none of the others was less than ten days old.

"Mrs. Rail and Dr. McDaniel are held on three charges, violations of sections 716, 855 and 856 of the Revised Ordinances of Kansas City. These sections provide that physicians must report all births and deaths to the Board of Health; that no person may conduct a baby farm without a permit from the Board of Health, and that infants for adoption must be reported to the Board of Health, and that permits for their adoption must be obtained by those adopting the child and also those giving away the child."

## "FORMERLY OPERATED A BABY FARM."

"Mrs. Rail formerly. operated a baby farm at 1735 Washington Street. The police knew about her then but she was never molested." (Meaning to charge, and being understood by the readers of said article, to charge that the plaintiff had a police record at the time of her alleged residence at 1735 Washington Street.)

"More than a year ago the woman moved to the Tencrede Apartments at 1515 Harrison Street, but it was not suspected until recently that she was again

trafficking in babies.'' (Meaning to charge, and being understood by the readers of said article to charge that the plaintiff bought and sold babies.) ''She occupies the third floor apartment on the front side of the house.''

''There are two entrances, one by the front door into a vestibule, from which a stairway leads to all the apartments, three on either side, and a rear entrance by way of stairs, leading up from an areaway.

''There are five rooms in the apartment. The babies which Mrs. Rail had in her possession from time to time were kept in three middle rooms, so that any visitors coming into the front room, and trades people coming in from the rear, never saw the babies.'' (Meaning to charge and the readers of said article understood the defendant to charge and the defendant meant that the readers of said article should understand the same to charge that this plaintiff was keeping the said babies secretly so that she could dispose of them in unlawful ways.)

### ''NEVER SAW BABIES TAKEN INTO HOME.''

''Persons occupying other apartments in the house told a Post Reporter that they did not know Mrs. Rail was operating a baby farm until the police came there last night. They never saw Mrs. Rail taking babies in or out, they said, and the police supposed she transported the babies at night by way of the back stairs.'' (Meaning to charge, and being understood by the readers of said article to charge and the defendant meant that the readers of said article should understand the same to charge that the plaintiff maintained a covert repository in which she insiduously and secretly received babies and concealed them until she disposed of them by murdering them and dumping their dead bodies into the sewers.)

''When she was arrested, Mrs. Rail made but a brief statement to the detectives, denying that she was working in co-operation with Dr. McDaniel. 'I have not been working with him,' she said. 'The babies I

had were sent to me by their mothers.' 'In some cases Dr. McDaniel was the attending physician and recommended me, but he has nothing whatever to do with my place.'.

"To a Reporter for the Post (meaning this defendant) Dr. McDaniel denied that he had violated any of the city or State laws in regard to the birth or adoption of babies."

"EVERYTHING PROPER DECLARES DOCTOR."

" 'Every birth I have attended,' he said, I have certified according to law within the required ten days.' 'In every case where a child has been adopted, in which I had any part, papers have been executed and filed properly.'

" 'I have not been connected with any of Mrs. Rail's enterprises or with'— (Continued on page 5, column 3).

"(THEN FOLLOWS DIVERS PICTURES OF BABIES AND A PICTURE OF AN APARTMENT HOUSE.)

"AT TOP—FOUR BABIES FOUND IN APARTMENT OF MRS. RAIL AT 1515 HARRISON STREET. AT LEFT—THE APARTMENT HOUSE WHERE MRS. RAIL LIVES. AT RIGHT—ONE OF THE CHILDREN FOUND BY THE POLICE."

"BABY FARM RAIDED; PHYSICIAN AND A WOMAN ARE HELD."

"FOUR INFANTS FOUND IN APARTMENT. IN AN APARTMENT BUILDING 1515 HARRISON STREET."

(Continued from page 1).

" '2111 East Seventh Street, although I have attended cases at the latter place.'

"At 2111 East Seventh Street this morning a young woman who said she was a sister to Miss Opie Stevenson, the manager, denied that the place was a lying-in

institution.   She said that Miss Stevenson was out of the city.

" 'We have a boarding house here' she said. 'And we take well boarders as well as sick ones.'   'I think Dr. McDaniel has been here a few times, but I do not know what for.' "

The answer admits the publication, denies that it was false and defamatory, and pleads justification and and privilege.   The material facts of the case thus may be stated:

Plaintiff was married in 1893, in Ohio, to August P. Lundin and was granted a divorce from him in 1902. They had three children, two boys and a girl, who remained in the custody of their mother and were supported by her.   She had no means and worked for a living.   At different times she keep boarders, conducted a rooming house, worked in a department store and as car cleaner for the Pullman Company.   In 1905, she married F. P. Rail at Atlantic, Iowa, and they lived together at Omaha for six months when she left him, on account of ill treatment, and removed with her children to Kansas City.   In November, 1909, she began keeping boarders at number 1735 Washington Street and applied to her family physician for employment as a nurse in confinement cases and was referred to Doctor McDaniel, who appears to have been interested professionally in a lying-in hospital.   Frequently he attended confinement cases in that institution in which he undertook to provide temporary care for the infants until he could find permament homes for them.   He arranged with plaintiff for her to care for such babies at her home, agreeing to pay her two dollars per day for her services in each case. She was not to be informed of the history of her respective charges, was expected to make no inquiries, but was to receive the babies sent by the doctor, give them proper care and attention and deliver them to persons provided with written authority from the doctor to receive them.   Two babies were sent to her and cared for by her under this employment while she lived on Washington Street.   Then she and her family moved to

a flat on the third floor of an apartment house at number 1513 Harrison Street and altogether she received six babies at that place, four of whom were in her custody at the time of her arrest by officers of the Hospital and Health Board. No infant had died while in her charge. She had not complied with the provisions of a city ordinance for the regulation of "baby farms" which required that "any person . . . engaged in the business of keeping or boarding more than one child under two years of age for pay or receiving infants for the purpose of securing homes for them for pay shall obtain a permit from the Board of Hospital and Health," etc. She states that she had no knowledge of these regulations and supposed that Dr. McDaniel, her employer, had done whatever might be required by the laws to authorize her to care for such babies at her home.

One night officers called and inquired if she had babies under her care and, being answered in the affirmative, asked to see them. She complied with the request and after viewing the babies the officers withdrew but later returned in an automobile, with a matron, and informed plaintiff of their purpose to take her and the four infants to police headquarters. Two of the babies were sick, one with yellow jaundice and the other with syphilitic sores, the night was cold for the season and it was raining hard. Plaintiff protested against taking such young babies, especially the sick ones, out in such a night, but being told by the officers that they would assume responsibility for the consequences, she cut a woolen blanket into four parts for wraps for the babies, and went with them to police headquarters. She was not accused of mistreating these or any other babies, and the only charge made against her was that of running a "baby farm" without a license. She was released on bond and the babies were sent by the officers to a public institution where one died the next morning. Plaintiff pleaded guilty to the charge filed against her and was sentenced to pay the minimum fine of $25 prescribed by the ordinance.

The only evidence introduced by defendant which might be interpreted as reflecting upon the conduct of plaintiff towards· the babies is the testimony of officers and physicians of the Hospital and Health Board that they were sickly, appeared to have been drugged, and that ·one had syphilis and another yellow jaundice. All of the babies were very young, one not being a day old, and the two diseased ones were born diseased. One of the police officers testified that at a time before plaintiff moved to Harrison Street the body of an infant had been taken out of a manhole "on east Thirteenth Street." This was the only foundation for the statement in the published article that six dead babies had been found "within the last few months in sewers in the neighborhood of Thirteenth and Fourteenth and Harrison Streets." Plaintiff had never been arrested before and, as far as the record discloses, had always borne a good reputation, and there was no support for the statement in the article that she was "well known to the police." The statement that she was "Mary Rail alias Miss Chardis Lundin" was based on the fact that her telephone appeared in the telephone directory in the name of her daughter, Chordice Lundin, who was then only ten or eleven years old. This and some other circumstances disclose that plaintiff was observing secrecy in conducting her business, though her neighbors in Washington Street were told by her that she was taking care of babies for hire. There is no support in the evidence for the statement that plaintiff was questioned about the six dead babies "taken from the sewers in that neighborhood during the last few months," and "said she knew nothing about them."

The evidence relating to the plea of justification may be compressed into the statement· that plaintiff was conducting a baby farm without a license and with secrecy—though with no greater secrecy than might be expected of one engaged in that kind of business.

The court overruled defendant's demurrer to the evidence and at the request of plaintiff instructed the jury: (1) "The court instructs the jury that the falsity

of all defamatory words is presumed in plaintiff's favor and she need give no evidence to show them false. The burden is on the defendant to rebut this presumption by giving evidence, if any, in support of the plea of justification.''

(2) ''The jury are instructed that in this case the defendant pleads justification; that is, it declares the statements contained in the publication complained of are true of and concerning the plaintiff. Under this plea, it is defendant's duty to prove the truth of the statements in the publication complained of in plaintiff's petition. And it is not sufficient for defendant to prove the truth of merely a portion of the statements contained in the publication complained of. Even though the defendant proved the truth of a portion of said. publication, yet your verdict should be against defendant's plea of justification if you find from the evidence that it has failed to prove any material statement in the publication complained of, providing such statement is found by you from the evidence to be false and a libel upon plaintiff.''

(3) ''The court instructs the jury that the term 'malice' or 'malicious,' as used in these instructions, does not mean mere spite or ill will, but it means the intentional doing of a wrongful act without just cause or excuse.''

(4) ''The court instructs the jury if you find and believe from the evidence in this case that the defendant, National Newspaper Association, on or about August 24, 1910, published a certain newspaper in Kansas City, Jackson County, Missouri, called the Kansas City Post, and that defendant then published in said newspaper the article mentioned in evidence about the plaintiff, and that said article was libelous of the plaintiff and untrue, then your verdict will be for the plaintiff.''

(5) ''The court instructs the jury that libel is the false and malicious defamation of a person made public by any printing, writing, sign, picture, representation or effigy, tending to provoke her to wrath or expose her

to public hatred, contempt or ridicule, or to deprive her of the benefits of public confidence and social intercourse.''

(6) ''The court instructs the jury that if you find for the plaintiff you will assess her damages at such sum as you may believe from the evidence will compensate her for the damage to her reputation and good name, if you believe her reputation and good name has been damaged, and for the mortification and humiliation and mental suffering endured by her, if you believe she did so suffer by reason of the printing and publishing by the defendant of the article complained of, not to exceed however, the sum of $25000.''

''And if the jury believe from the evidence that the defendant maliciously printed and published the article complained of about plaintiff, then you may, in addition to any compensatory damages above referred to that you may have assessed against said defendant, assess also against said defendant such punitive or exemplary damages as you may deem proper from the evidence, as a punishment to said defendant for the wrong done to plaintiff and as a warning to others, not, however, to exceed the sum of $25000.''

On behalf of defendant the jury were instructed:

(1) ''The court instructs the jury that the language in the article published concerning plaintiff contains no language charging plaintiff with any crime or offense under the law except in so far as charging plaintiff with having kept a baby farm, and under the evidence the court instructs the jury that said charge was proven in this case.''

(2) The court instructs the jury that the burden of proof in this case is upon the plaintiff to establish by a preponderance of all the testimony the following facts:

First.    That the publication complained of was a materially inaccurate and therefore unfair report of the arrest of plaintiff and what occurred at the Municipal Court in Kansas City, August 24, 1910.

Second. That the language, as used in said article, was understood by those who read it to mean that plaintiff was a wicked and dangerous woman.

Third. That said article, as published, was false and defamatory to plaintiff, and unless you find all of these facts in favor of plaintiff from a preponderance of all the evidence, your verdict must be for the defendant.''

(3) ''The court instructs the jury that they are the judges of the weight of the evidence and of the credibility of the witnesses, and in determining the weight to be given to the testimony of each witness, you may consider the interest, if any, such witness may have in the result of this litigation and the conduct of the witness on the stand, and if you believe that any witness has wilfully, sworn falsely to any material fact, you may reject the whole testimony of such witness.''

(4) ''The court instructs you that in this case words are to be taken in their ordinary English meaning and in that sense in which the ordinary reader would understand them. It does not matter how the plaintiff understood them or what the writer intended, but the article can only be libelous when the ordinary reader would understand it in a defamatory sense.''

(5) ''The court instructs the jury that you, and you alone, are the sole judges of the law and evidence in this case. Therefore, it is for you to determine from the evidence whether or not there is anything in the article published of and concerning plaintiff on August 24, 1910, that in any way reflected upon the character of plaintiff that has not been proven to be true, and if you believe from the evidence that the allegations in said article have been substantially proven in the case, then you must find for the defendant.''

We agree with counsel for defendant that, in solving the question of the propriety of the action of the trial court in granting a new trial, we are not restricted to a review of the reasons which prompted that court to make the order, but if such reasons are found insufficient, the order will be sustained, if any

valid ground therefor appears in the record and was properly preserved in the motion for a new trial. As is said by the Supreme Court in Chlanda v. Transit Co., 213 Mo. 244, though the trial court may give but one reason "and that a bad one, if there were other good reasons, then its action, producing a right result in the administration of justice can stand." The trial court refused to hold that error had been committed in overruling the demurrer to the evidence, but under the rule just stated, we first will dispose of the contention that the court should have directed a verdict for defendant.

Although the jury are the judges of both law and fact in libel cases, the function of the trial judge to give instructions is the same as in other cases, with the exception that in libel cases the instructions are merely advisory; and in such cases, as in others, if the pleadings and evidence fail to disclose a cause of action, the court has authority to direct the jury to return a verdict for the defendant. In Tilles v. Pulitzer Pub. Co., 241 Mo. l. c. 647, the rule is stated that "if under the pleadings and evidence no case is made, the court may take the case from the jury by a peremptory instruction in the nature of a demurrer. . . . . Libel suits, though *sui generis* (in a sense) are subject to those rules of practice found wise and useful in administering justice generally in the courts." [See, also, Diener v. Pub. Co., 230 Mo. l. c. 621; Heller v. Pub. Co., 153 Mo. l. c. 214; Branch v. Krupp, 222 Mo. l. c. 598; Jones v. Murray, 167 Mo. l. c. 53.]

Counsel for defendant is correct in saying that the business of keeping a baby farm is not unlawful and is recognized by the municipal laws as a vocation which may be honorably followed under a license issued by the Board of Hospitals and Health. But we cannot agree with the view that the only matter in the published article which could be regarded as libelous *per se* was the charge, conceded to be true and, therefore, fully justified, that plaint. _ was prosecuting that business without a license and was arrested and taken to police

headquarters for that offense. That view proceeds from an erroneous conception of the effect upon the action of the innuendoes, pleaded in the petition, which were employed by the pleader to explain and apply to plaintiff every defamatory charge in the article, except the charge that plaintiff was operating a baby farm without a license, in violation of the ordinance. Plaintiff offered no evidence in support of the innuendoes and her counsel claim in their brief, and the instructions given at their reguest indicate, that they abandon them at the trial and proceeded upon the theory that every defamatory charge in the article was libelous *per se,* and that the innuendoes in the petition should be ignored as mere surplusage.

Defendant argues that plaintiff is bound by the construction she placed upon the article in her petition, and, if this were a sound view of her position, it would follow that her failure to prove the facts alleged by way of innuendo left her without a case to go to the jury, since all the charges thus left untouched were true and the defense of justification as to them was complete.

The office of the innuendo, as defined by the decisions in this State, is to set a meaning upon words or language of doubtful or ambiguous import which alone would not be actionable, and it follows, as is said in the case from which this definition is taken (Callahan v. Ingram, 122 Mo. 356), "that in case the defamatory meaning is apparent from the words used, an innuendo is unnecessary . . . In such case the defendant can put in issue the truth of the words spoken, either with or without the alleged meaning. It will then be for the jury to say from the proofs whether the plaintiff's innuendo is sustained. If not, the plaintiff may fall back upon the words themselves, and urge that, taken in their natural and obvious significance, they are actionable in themselves without the alleged meaning and that, therefore, his unproved innuendo may be rejected as surplusage."

This definition of the office of the innuendo was re-affirmed in Julian v. Kansas City Star, 209 Mo. l. c. 91, and its application to the instant case leads to the con-

clusion that plaintiff was not bound to prove matters of innuendo relating to false charges in the article which were libelous *per se.*

The statutes (sec. 4818, R. S. 1909) define libel to be "the malicious defamation of a person made public by any printing, writing, sign, picture, representation or effigy tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse." It is not necessary that the defamatory words should impute to the plaintiff the commission of a punishable crime. If "they contain that sort of imputation which is calculated to villify a man and bring him, as the books say, into hatred, contempt, or ridicule," they are actionable. [Starkie on Slander and Libel, pp. 231, 232.]

If "hatred, contempt and ridicule would naturally be produced by the words employed . . . they would be libelous *per se.*" [McGinnis v. Knapp, 109 Mo. l. c. 149.] Words are libelous *per se* which within themselves necessarily carry a defamatory meaning and are not libelous *per se* if they are susceptible of a reasonable interpretation which excludes a defamatory imputation. [Lemaster v. Ellis, 173 Mo. App. 332.] In the case just cited the alleged slanderous words were that a man and a woman had run away together and "are now together in Pueblo." It was held they were not slanderous *per se,* since they did not "in and of themselves necessarily carry a slanderous meaning and impute acts of fornication," and the plaintiff was required, in order to recover, to plead and prove an innuendo. The authorities agree that where there is no ambiguity in the words—no double meaning—but they carry within themselves an imputation against the plaintiff of conduct which naturally would subject a person to hatred, contempt or ridicule, such words are to be regarded as libelous *per se.*

The charges and imputations in the article against plaintiff were clear, certain and free from ambiguity.

No reasonable person could read them without under-standing that she was charged with the hideous practice of mistreating, if not actually murdering, babies given into her custody, and of disposing of the bodies of babies dying while in her possession, by secretly casting them into public sewers in the vicinity of her residence. The evidence adduced by defendant in justification afforded only the weakest support for such a charge. Clearly the article was libelous *per.se,* and the court did not err in refusing to direct a verdict for defendant.

Passing to the instructions given at the request of plaintiff we find them free from prejudicial error, and that the reason assigned by the trial court for granting a new trial is not well founded. We have already shown that it was not necessary to submit issues of fact predicated upon the idea that the defamatory words were not libelous *per se.*

Instruction numbered one is supported by the decision of the Supreme Court in Cook v. Printing Co., 227 Mo. l. c. 531, in which it is said: "The falsity of all defamatory words is presumed in the plaintiff's favor and he need give no evidence to show them false. The burden is on defendant to rebut this presumption by giving evidence in support of the plea of justification." [Citing Newell on Libel and Slander (2 Ed.), p. 651; Odgers on Libel and Slander, 170.]

The second instruction states a correct rule. [Merriwether v. Knapp, 120 Mo. App. l. c. 385; Cook v. Printing Co., supra, l. c. 531.]

If proof of the truth of some of the facts stated in an article containing defamatory matter would be accepted as a justification of the defamation, the action for libel would no longer serve as an adequate protection to the reputation of the innocent, since it is seldom that the traducer does not endeavor to give substance and greater force to falsehood by mixing some truth with it. It is aptly said in Cook v. Printing Co., supra, that the defense of justification must be as broad as

the charge— "proof of a part of the charge will not amount to a complete defense." The inclusion of the term "any material statement" in that instruction does not amount to reversible error, for the reason just stated, that the defense of justification to which the term refers, must cover the defamatory matter in its entirety and the jury must have understood the term as referring to matters of defamation in the article. We must assume that the jury were possessed of ordinary understanding and common sense and if they were, they could not have understood this instruction as meaning that the defense of justification must fail if it established the truth of every defamatory charge.

The definition of *malice* in instruction numbered three is accurate. "When slanderous words are spoken, or a libelous article is published falsely, the law will affix malice to them. There is no necessity of proving express malice." [Buckley v. Knapp, 48 Mo. 152; Fugate v. Millar, 109 Mo. 1. c. 288; State v. Weeden, 133 Mo. 70; Minter v. Bradstreet Co., 174 Mo. 1. c. 496.] "Malice in common acceptation means ill will against a person but in its legal sense it means a wrongful act done intentionally without just cause or excuse." [State v. Weeden, supra.]

No objections can be found to instruction numbered 4, under our ruling that the article was libelous *per se*. Instruction 5, contains a proper definition of libel, and instruction 6, correctly stated the measure of damages. The point that instructions 1, 2, 4 and 6, cannot be reconciled with defendant's instructions numbered 1 and 2, is answered by saying these instructions of defendant were erroneous for reasons already sufficiently stated and defendant is in no position to claim any advantage from errors committed in its favor.

There was no prejudicial error at the trial and the verdict should not have been set aside. The judgment is reversed and the cause remanded with directions to enter judgment for plaintiff on the verdict. All concur.

## ON REHEARING.

ELLISON, P. J.—A reconsideration of this case has left us convinced that our disposal of it at the other hearing was correct. But as defendant insists that the opinion rendered at that time approves plaintiff's instruction No. 2, and that said instruction wrongly affirms that defendant by its answer had admitted that the publication was of and concerning the plaintiff, when in fact the answer did not make such admission, we will add the following to what has been said. Defendant's answer in the respect here involved is not as clear as could be wished. It, in terms, admits it published the article as set out in the petition, but denies that it was false or defamatory, or that it was a libel on plaintiff; "and denies each and every other allegation in plaintiff's petition." And "that said article so published by it is substantially true in so far as it refers to plaintiff; that is, it is true, as stated in said article that plaintiff did maintain a baby farm" etc., setting out a small part of the publication which defendant insists was all which concerned the plaintiff. Instruction No. 2 does state, in effect, that defendant pleads, or admits, that all the statements in the publication are true, and that they were made of and concerning the plaintiff. So this last clause, thus embodied in the instruction, is erroneous; for it, in effect, states that defendant admits that the whole article was of and concerning the plaintiff.

But there is no rule oftener stated than that though an instruction contains error, the judgment will not, for that reason, be reversed if it be manifest that the error was harmless.

It is clear that notwithstanding the court erred in stating defendant admitted that the entire article referred to plaintiff, yet, if in point of fact, the entire article, in all material respects, without ambiguity, did refer to plaintiff and, upon its face, showed it was published "of and concerning" her, then no harm could result from stating that defendant admitted it.

198 M. A.—31

We will therefore proceed to inquire whether other parts of the article than the part confessed by defendant, did undoubtedly and unequivocally refer to plaintiff. The entire article as published, is set out in Judge Johnson's opinion and it seems to us need only to be read to show, without ground for difference of opinion, that it referred to plaintiff. In the first place the article is headed in capital type that a baby farm had been "found" in an apartment. That plaintiff and a doctor were arrested and that the "woman was well known to the police" and that she or they (no difference which) "Formerly ran a home for babies on west side." That (partly in capital type): "BODIES OF SIX INFANTS FOUND IN KANSAS CITY SEWERS RECENTLY. UNABLE TO TELL THE POLICE HISTORY OF ANY CHILD IN HER CHARGE; WOMAN DENIES RESPONSIBILITY FOR DEATH OF CHILDREN; ONE BABY DEAD; ANOTHER DYING AT ST. ANTHONY'S HOME.

"Pursuing their investigations into the finding of six dead babies within the last few months in sewers in the neighborhood of Thirteenth and Fourteenth and Harrison Streets, the police last night went into the apartments of Mrs. Mary Rail, alias Miss Chardis Lundin."

Then after stating that plaintiff and the doctor were arrested on a charge of violating a city ordinance governing the birth and death of infants, there is a subheading in capital type, viz., "DENIES KNOWLEDGE OF OTHERS FOUND DEAD," followed by this: "When questioned about the bodies of the six babies taken from the sewers in that neighborhood during the last few months, the woman said she knew nothing about them. She refused to tell the officers of any persons with whom she had found homes for the little ones left in her care. She would not give the history of any particular baby—where she got it, what she did with it, who was its mother or who had adopted it. Nothing that she said served to clear up the mystery which the police have been working upon for

many months.'' Then after reciting matters tending
to discredit her alleged story to the police, it is said
that she ''formerly operated a baby farm at 1735
Washington Street. The *police knew about her then*
but she was never molested. More than a year ago
the woman moved to the Tencrede Apartments, at 1515
Harrison Street, but it was not suspected until recently
that she was again trafficking in babies.'' Then after
describing the apartment, it is stated in the article
that persons in other apartments in the house never
saw plaintiff ''taking babies in or out, they said, and
the police supposed she transported the babies at night
by way of the back stairs.''

In the light of these quotations, it is not seen how
anyone can say, and be in earnest about it, that the
article did not refer to plaintiff. But the argument
accompanying defendant's motion for rehearing seems
to imply that if a defendant denies anything, no matter
if it is a denial that there are seven days in a week,
plaintiff must prove it. A denial of anything which may
be questioned does call for proof. But denial of a
patent fact, appearing on the record does not. Here
the face of defendant's answer conceding that while
containing a denial that any but a small part of the
article concerning her arrest, referred to plaintiff,
admits it published the article and asserts that it
was true. So that, as above intimated, the only thing
left to consider outside this, is to ascertain if such
article on its face, without ambiguity, referred to plain-
tiff. And having found that it did, the error in plain-
tiff's instruction was harmless.

That part of the publication which defendant in
its answer admitted had reference to plaintiff was a
statement of the fact of her keeping a baby farm and
her arrest for violating a city ordinance relating to the
births and deaths of children. This we readily concede
was privileged, relating, as it did, to a public court
proceeding. There is thus left the question whether
the remaining part is libelous *per se*. The statute (sec.
4818, R. S. 1909) defines a libel to be, ''A malicious

defamation of a person made public by any printing . . . tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse, . . . ." It will be seen by reference to the article pleaded, as set out in Judge Johnson's opinion, that innuendoes are set forth whereby it was alleged that defendant intended to be understood as charging plaintiff with crimes, including murder. But it appears that at the trial these were abandoned by the plaintiff and the case left to stand upon the words of the publication free from explanation. The law is that if the words published are libelous without the aid of an innuendo, then matter of innuendo pleaded may be treated as surplusage. [Callahan v. Ingram, 122 Mo. 355; Julian v. Kansas City Star, 209 Mo. 35, 91; Cook v. Globe Democrat Printing Co., 227 Mo. 471, 526.]

In considering whether the article, stripped of the innuendoes, was libelous *per se,* we should treat plaintiff as innocent of the statements published of and concerning her and then answer, not whether she was charged with a crime for that is not a necessary requisite to libel, but whether such statements would, in the language of the statute, tend to expose her to public hatred and contempt, or to deprive her of the benefits of public confidence, or social intercourse. If they do, they are actionable. [Cook v. Globe Printing Co., 227 Mo. 1. c. 529; Starkie on Slander & Libel, 231, 232.] Manifestly, the article cast suspicion upon plaintiff as one who threw bodies of babies into sewers, if not herself murdering them, and that she was so suspected by the police. That she was known under an *alias;* that she was what was known as a police character and that she trafficked in motherless babies, carrying them in and out of her house by back stairs in the nighttime. If this was not true, it would be difficult to state a more aggravated libel.

Plaintiff's instructions are attacked by defendant, especially No. 2 and, as already stated, it was for some

supposed fault with them that the trial court granted a new trial. We think that save in the respect we have ruled to be harmless, instruction No. 2 is correct. It required defendant to prove the truth, not of *all* the statements complained of and published, whether material or not, but of all the statements "found from the evidence to be false and a libel upon plaintiff." That is held to be a correct proposition of law. [Cook v. Globe Printing Co., 227 Mo. 471, 531; Meriwether v. Knapp Co., 120 Mo. App. 354, 385, 386.] In this respect the instruction is different from that condemned in Reynolds v. Knapp & Co., 155 Mo. App. 612, 618.

But here again appears defendant's dominating idea that since it denied that the article referred to plaintiff except the small portion of it set out in the answer, and since it justified as to that small part, therefore the cases just cited were not applicable. But defendant's denial in connection with it's admission, we have already shown amounts to no more than if it should deny the alternation of the seasons. It admitted it published the whole article and alleged the whole article was true, but denied that it referred to plaintiff, except in the part concerning the baby farm and the arrest. We have already shown that its denial was in the face of the patent fact that the balance of the article, in all material respects, did refer to plaintiff. Hence, so far as it concerns the result, defendant is in the exact position it would have been had it admitted that the whole article, in all material respects, referred to plaintiff and justified by alleging, as it has, that it was the truth.

Plaintiff's first instruction is a correct statement of the law and what we have said shows it was properly given in this case.

It follows that the judgment must be reversed and the cause remanded with directions to set aside the order granting a new trial and to enter judgment for plaintiff in accordance with the verdict. *Johnson* and *Trimble, JJ.,* concur in separate opinions.

TRIMBLE, J. (concurring)—I concur in the foregoing opinion with the observation that the article so clearly and obviously refers to plaintiff in its entirety, and, in the parts outside of those claimed to be privileged and sought to be justified, is libelous *per se,* the instruction should not be considered as harmlessly erroneous but as not erroneous at all.

## ON REHEARING.

JOHNSON, J.—I concur in all that is said in the foregoing opinion on rehearing except the statement that the answer does not admit the whole article was published of and concerning plaintiff and that it was error, but harmless error, for plaintiff's second instruction to say that it did. Since as we have found the whole article is libelous, *per se,* and obviously refers to plaintiff in its entirety, and the answer admits its publication, it must follow that such admission included an admission that the entire article—not merely culled out parts thereof—was published "of and concerning plaintiff." There is no error, harmless or otherwise, in instruction number two, nor in any of the other instructions given at the request of plaintiff, and the motion for new trial should not have been sustained.