J. Raymond DYER, Appellant,

v.

SECURITIES AND EXCHANGE COMMISSION, Appellee.

No. 16554.

United States Court of Appeals
Eighth Circuit.

June 30, 1961.

Rehearing Denied Aug. 2, 1961.

J. Raymond Dyer, St. Louis, Mo., pro se.

Mahlon M. Frankhauser, Atty., Securities & Exchange Commission, Washington, D. C., for the Securities & Exchange Commission. Thomas G. Meeker, Gen. Counsel, Walter P. North, Associate Gen. Counsel, Aaron Levy, Asst. Chief Counsel, and Paul J. Kemp, Atty., Securities & Exchange Commission, Washington, D. C., were with Mahlon M. Frankhauser, Washington, D. C., on the brief of appellee.

Before JOHNSEN, Chief Judge, and VOGEL and BLACKMUN, Circuit Judges.

JOHNSEN, Chief Judge.

This appeal is one by J. Raymond Dyer from a decree of injunction rendered against him, 180 F.Supp. 903, in a suit instituted by the Securities and Exchange Commission under § 18(f) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79r(f), and also from an order dismissing a counterclaim filed by him.

The decree enjoined Dyer from soliciting any proxy from stockholders of Union Electric Company, of St. Louis, Missouri, or addressing any communication to them which under the circumstances of its situation would constitute a proxy solicitation, unless he complied with the filing requirements of the Commission's regulations as to proxy solicitation, and unless further, if the situation should be one in which the Commission ordered the filing of a declaration, the solicitation was made pursuant to such a declaration which the Commission had permitted to become effective.

The filing requirements of the Commission's regulations are discussed in our opinion in Dyer v. Securities & Exchange Commission, 8 Cir., 290 F.2d 541. There also is listed in that opinion the series of cases which Dyer has thus far brought before us, in his attempts to have overthrown orders made by the Commission in respect to proxy solicitations for stockholders' meetings and to other affairs of

Union Electric, from the time that he took up the role of antagonist to Union's existing management.

Dyer first made his entry onto the corporate scene in 1956. That year, his then-minor daughter became the owner of 100 shares of common stock in Union Electric and, on the basis of a power of attorney executed by her in his favor, Dyer undertook to make demands on and engage in controversies with the officers of the corporation. Management refused to recognize the daughter's power of attorney as providing any basis to require it to deal with Dyer as to the corporation's affairs, in view of the lack of legal status of such an instrument given by a minor under Missouri law. See Dyer v. Securities & Exchange Commission, 8 Cir., 266 F.2d 33, 43.

Thereupon, Dyer, in January, 1957, purchased some shares of stock in his own name and again commenced to engage in disputes and demands on management, particularly as to such proxy material as would be sent out by management for the annual meeting of April 20, 1957, and as to the inclusion of proposals and statements by him therein. Some of these aspects, as they came to be involved before the Commission, are set out in our opinion in Dyer v. Securities and Exchange Commission, No. 15,765, 8 Cir., 287 F.2d 773.

Dyer was not averse to having public heralding made of what he was attempting to do and hoping to accomplish. In the instance here relevant, he had, on February 10, 1957, sent an article to the Harvard Law Record, entitled "The Gentle Art of Proxy Contesting or the SEC's New Marquis of Queensbury Rules", which appeared in that publication, under his name as author.

The article had been forwarded to the editor by Dyer in the form of a letter, stating: " * * * I was delighted to receive your invitation of February 2 to write about the Union Electric proxy contest". The article went on to characterize the Commission's regulations on solicitation of proxies as "Marquis of

Queensbury Rules of Procedure for the fascinating game of proxy contesting". It declared the rules to be "astonishing in their clarity"; to be "all stacked in favor of the stockholders"; and to provide the means for insurgent stockholders "with just a little intelligence and some cooperative action (and some money, of course,) to nudge their vested interest management right out of the corporate nest".

As published, the article concluded with this paragraph: "Yes, proxy contesting is a fascinating game. Much food for thought. Much opportunity for conjecture. No wonder the game is becoming more and more popular. It is a gamble, of course, but if you win it can be highly lucrative. Much more lucrative than the average contingent fee damage suit. For, just as in political contests, to the victor belong the spoils".

Management felt that this expression on Dyer's part of apparent interest and object was entitled to be brought to the attention of the stockholders of Union Electric, in its seeming relation to the efforts, protests and proposals engaged in by him as to management's 1957 proxy material. It prepared and filed with the Commission a letter for inclusion with its proxy material, quoting the paragraph above set out and making some comments in respect thereto, such as, that "This is an astonishing statement"; that "The attitude expressed by Mr. Dyer has no place in the affairs of Union Electric"; and that the huge investment of stockholders and the widespread service of the corporation as a public utility "should not be the object of 'spoils' or a 'gamble' or a lawyer's 'game' that 'can be highly lucrative' ".

Dyer immediately reacted with a charge that this was a false and vicious maligning of him and his motives and threatened that he would immediately file a suit for libel if the letter was sent out. He asserted, and he argues here, that the Harvard Law Record article was written and intended by him as mere humor, and that it was not entitled to be read or held out in any other light. He cites here the last two paragraphs of the article, which were contained in his manuscript but were deleted by the editor, as being in his view unmistakably demonstrative of its purely satirical nature and object.

In the first of these omitted paragraphs, Dyer had purported to make a proposal that there ought to be established a professorship to "teach the rules of proxy contesting at the Harvard Law School", and had added the suggestion, "I'm not very well qualified, as yet, but I would love to be offered that chair, after this Union Electric contest is over".

He concluded with this paragraph: "The course would have no dearth of students, I can assure you. Not the way I would teach it. The pastures are green, the field is not preempted, the Marquis of Queensbury Rules are not too hard to learn, and for sheer intellectual pleasure I know of nothing that can rival proxy contesting outside of sex".

Whether or not Union Electric's management and stockholders were obliged to find only entertainment in Dyer's article, management in any event ultimately decided not to send out the letter which it had prepared, and it so notified the Commission. Dyer, however, in the meantime had had a post card printed and addressed for mailing to every stockholder, which he transmitted a copy of to the Commission, with the statement that he intended to send it out "in opposition to declarant's [Union's] proxy solicitations".

The Director of the Commission's Division of Corporate Regulation promptly advised Dyer that the mailing of the card would under the circumstances constitute proxy solicitation on his part, in which he could not lawfully engage without complying with the order which the Commission had issued in the situation on February 27, 1957. That order prohibited anyone ("Union and all other persons") from soliciting proxies for purposes of the stockholders' meeting of April 20, 1957, except upon the filing of a declaration under § 12(e) of the Act,

15 U.S.C.A. § 79*l*(e), and Rule U-62 of the Commission's regulations, 17 CFR § 250.62, and upon the Commission's allowing the declaration to become effective.

Dyer disagreed with the view of the Division of Corporate Regulation that the sending out of the card by him would constitute proxy solicitation. He went ahead, mailed all the cards, and sent the Commission a telegram, stating he had done so and declaring, "No violation of any order involved". Shortly before the cards were mailed, he had filed a petition in this Court for review of the order which the Commission had made allowing the declaration filed by management pursuant to the Commission's requirement of February 27, 1957, to become effective for proxy-solicitation purposes by it. That review proceeding was the one which was involved, with affirmance being made of the Commission's order, in Dyer v. Securities and Exchange Commission, No. 15,765, 8 Cir., 287 F.2d 773.

One side of Dyer's post card contained only the following sentence: "If you can keep your head when others all about you are losing theirs then maybe you don't understand the problem". On the other side of the card, in addition to the name and address of the stockholder, and Dyer's return, there appeared two captions, "Truth in Union Electric", and "Stockholder Democracy—Stockholder Responsibility", together with the following communication over Dyer's reproduced signature: "Dear Stockholder: Have you been keeping score on Union Electric? Truth is the problem. I have filed with the U. S. Court of Appeals objection to the SEC's approval of management's proxy solicitations. I think truth will prevail".

It was because of Dyer's mailing of this card that the suit here involved was instituted by the Commission. In his testimony on the trial, Dyer declared that his purpose in mailing the card was to "simply put the stockholders on notice that I am going into the Court of Appeals, nothing more". At another point in his lengthy testimonial discourse, he insisted that he had an inherent right to counteract the letter which management had prepared for stockholder distribution—termed by him a "libelous and scurrilous canard"—as a matter of privilege of self-defense and protection of his professional reputation. He was convinced, he said, that he was "going to be in trouble with a bunch of stockholders, sixty thousand of them", if he did not thus engage in defending himself.

Although, as above indicated, management had notified the Commission that it was withdrawing the letter from its proxy material, and although a copy of this communication had been transmitted to Dyer and admittedly was in his possession at the time the cards were mailed, he gave as his explanation for nevertheless sending them out that he did not read the part of management's telegram relating to the withdrawal of the letter from its proxy material until the following day. Moreover, as he had previously expressed himself to the Commission, he also insisted that he did not regard the card as constituting a proxy solicitation and so did not view it as being a violation of the Commission's order of February 27, 1957.

The Commission's order of February 27 was, as noted above, a prohibition against the soliciting by anyone of "any proxy, power of attorney, consent, or authorization regarding the voting of any security of Union in connection with the annual meeting of Union's stockholders scheduled to be held April 20, 1957, unless pursuant to a declaration, filed under Section 12(e) of the Act and Rule U-62 promulgated thereunder, which has become, or shall have been permitted by the Commission to become effective".

■ Under Rule 14a-1 of the Commission's regulations, 17 CFR § 240.14a-1, the terms "solicit" and "solicitation" were made to include "(3) the furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revoca-

tion of a proxy". The trial court held that Dyer's card was such a communication to stockholders as constituted under the circumstances involved a solicitation of proxies, within the foregoing provision. Or, in different terms, the card represented a communication which in the circumstances of its receipt by a stockholder could be said to be reasonably calculated to affect his giving of proxy authority as to the 1957 annual meeting.

The court had made the following finding, to which its conclusion was related: "Defendant (Dyer) had a substantial interest in the outcome of the proxy solicitation by reason of his eight proposals which under the proxy regulations were included in management's proxy statement and form of proxy for a vote of stockholders. In mailing his communication defendant intended to muster stockholder support in favor of his proposals and to counteract management's opposition to seven of his eight proposals".

This appraisal of the nature and circumstances of Dyer's card, as being in object and capacity reasonably calculated to result in affecting the action of stockholders as to management's proxy solicitation and as to the proposals of Dyer contained therein cannot be said to be clearly erroneous. Dyer's protestation that all he was doing was engaging in self-defense and protecting his professional reputation, in inherent personal privilege, is without much indication from the abstractions in which he engaged on the card. There is no reference made to the letter against which he says he was attempting to defend himself and no comment by him on the motive which the quoted paragraph from his article had at least a tendency to suggest.

But whatever Dyer may have had in his mind in this regard, what he did was to address a communication to stockholders at the time of and in relation to a proxy-soliciting situation. The communication was in its nature and circumstances such as to entitle it rationally to be inferred that he knew or could be expected to foresee that the things which he said might on their implication and innuendo affect the action of a stockholder in his granting of proxy authority.

Thus, the communication was entitled to be held to have been reasonably calculated to have such a result. And insofar as the card might have involved any attempted expression of self-defense, that privilege was not one which, in the proxy significance of the communication, was a matter of free license to him, since it could not be said that the Commission's regulations afforded no basis for him to have this element recognized and given exercise, in appropriate form and substance, through a compliance with the Commission's order as to the filing of a declaration.

Finally, the violative aspect of what Dyer did was not a matter of innocence, thoughtlessness or fortuity, since he had been expressly advised that the post card could not lawfully be sent out except on the basis of a compliance with the Commission's order of February 27, 1957.

■ The Commission was accordingly entitled, in the vindicating and safeguarding of its regulatory authority, to seek an injunction under the statute, as it did, to prevent Dyer from engaging in any further such acts in the proxy situation involved, without compliance with its February 27th order. This was the scope of the relief which the complaint specifically requested, although it did also contain a conventional general prayer for "All other and further relief as is just and proper". But the February 27th order had application only to the annual meeting of April 20, 1957. The injunction which the court finally entered against appellant, however, extended to the proxy situations of any meetings of Union Electric which might thereafter occur.

The intent of the Commission in instituting the suit to simply curb Dyer's misguided proxy activity in its possible significance and consequence as to the 1957 meeting seems to us clearly mani-

fested by the things which the Commission did.

A hearing was immediately sought and obtained by the Commission on its application for a temporary injunction. Adequate showing was made to warrant the granting thereof but, upon Dyer's assurance to the court that he would not make reply to any response from stockholders which his card might prompt, the case was passed over for further hearing until after the annual meeting. Following the holding of that meeting, the Commission entered a voluntary dismissal of its action, under Rule 41(a) (1) (i) of the Rules of Civil Procedure, 28 U.S.C.A.—Dyer's time for pleading having not yet then expired, and he having in the meantime made no service of a motion or answer under the Rules.

Dyer, however, was not willing to allow such a termination of the litigation to occur. He filed and served an answer and counterclaim and moved the court to annul or vacate the Commission's notice of dismissal. The Commission regarded the result which it sought to accomplish in instituting the suit as having been effected and it accordingly opposed Dyer's motion to reopen. In the brief which it filed, it took the position that the sole subject matter of its complaint had been its order of February 27th; that this order was related only to the meeting of April 20, 1957; that any solicitation of shareholders as to any other meeting would involve compliance with other rules of the Commission not the order of February 27th; that "These matters would constitute other legal controversies because they are beyond the scope of the Commission's order of February 27th, which is the sole subject matter of the complaint herein"; and that "Since the meeting has been held and since the date has passed, * * * the question of compliance with the order of February 27, 1957, is now moot".

On Dyer's insistence that his position at the hearing on the application for temporary injunction had amounted to such an oral joining of issue by him in the case that the Commission ought not to be permitted to make dismissal of the action under Rule 41(a) (1), the court entered an order vacating and annulling the Commission's notice of dismissal. It thereafter accorded Dyer a trial on the merits of the case, except that it struck out certain allegations in his answer as not constituting proper matters of defense, and it also dismissed his counterclaim for want of ·jurisdiction. Ultimately, it wound up dismissing the action on its own motion for mootness, D.C., 22 F.R.D. 229.

Dyer came back with a motion to vacate this judgment and to accord him another trial. The court granted his motion to vacate the judgment of dismissal; refused, however, to accord him any further trial in the matter; took the case under submission on the record previously made; and thereafter entered the decree of injunction, which is the subject of this appeal.

A motion to vacate this judgment, set aside the court's findings of fact and conclusions of law, grant a new trial, and in incidence to allow him oral argument on the whole matter, was promptly filed by Dyer, which in due course was disposed of and the court records thereby cleared, so that there came to be for the first time a judgment which was not open to further attack by Dyer, except through the process of an appeal.

Due to the plethora of settings, hearings, motions, briefs, aspects of submission, considerations and reconsiderations which came to exist in the situation (and we have by no means set out all of the matters which the trial court files contain), the final decree did not come to be rendered until approximately three years after the suit was instituted. This situation was occasioned largely perhaps by Dyer's tenacious refusal to allow the litigation to come to an end and his attempts to prevent it from doing so, except upon the basis of a holding in his favor that the Commission never had been warranted in bringing the action against him.

As we have indicated and made affirmance of above, however, on that question the trial court properly held that Dyer's act of sending out the post card had constituted in the situation a violation of the Commission's order of February 27, 1957. It was a matter in which under the circumstances, even as to his alleged right to strike back at management's letter, there was no occasion for him and he was not entitled to engage, except through a resort to and a compliance with the requirements of the Commission's order as to filing a declaration and having it approved.

Dyer is accordingly not entitled to a reversal here on the ground that there never existed any warrant or basis for the Commission to institute suit and seek an injunction against him. He had violatively sent out the post card. In his insistence that he had a right so to do, there was reasonable ground to infer that he would equally regard himself as entitled to make reply to any inquiries or other responses from stockholders occasioned by the card. The Commission, therefore, with official responsibility, properly undertook to prevent him from engaging in any such further acts of violation of its February 27, 1957, order, in their proxy significance and relationship to the April 20th meeting.

■ We do not believe, however, that there is anything in the facts or history of the situation which remedially called for a decree beyond the nature and scope of what the Commission had deemed necessary and adequate in its institution of the suit. This was, as mentioned above, to stop Dyer, in his misguided notion of unqualified privilege of self-defense, from engaging in any further such acts of communication in the immediate proxy situation, except on the basis of compliance with the requirements of its February 27, 1957, order. The underlying concern of the complaint was the effect which such acts by him could have on the exercising of proxy rights or authority by the stockholders as to the April 20th meeting.

In the rendering of the court's decree, there was nothing relied on or shown that Dyer had done, in the three-year period since the filing of the suit, that was violative, or indicative of a general likelihood of future violations, of the Commission's rules on proxy solicitation. Additional annual meetings of the corporation had in the meantime been held. In the preliminaries to each of these, as the review proceedings which he has brought before us show, Dyer had as tenaciously wrangled with Union Electric and the Commission over Union's proxy material as he had done in the 1957 situation. But there is nothing that he did that is here claimed to have been a violation or a threat of violation of the Commission's proxy regulations, so as to be entitled to be taken into account in the court's rendition of its decree.

Except for Dyer's misguided notion in the initial circumstances that, regardless of the fact that a proxy significance would be involved in what he did, he had a right to by-pass the Commission's order as to filing a declaration and take matters into his own hands, whenever he regarded the element of personality as having been intruded into the proxy situation, the record does not suggest that he had an attitude of hostility and defiance toward the Commission's regulations and orders as such. In his Harvard Law Record article he had lavishly praised the regulations.

Nor does it seem to us that there is basis to infer that Dyer will not conform to the law here indicated as to how a privilege of self-defense asserted by him must be exercised in any other such situation of Commission order.

■ We therefore are unable to see a foundation for, a need of, or a public interest that would be served by, the injunction rendered. The language of the Supreme Court, in United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303, is here appropriate: "The purpose of an injunction is to prevent future violations * *. The necessary determination is that there

exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive."

As to the appeal taken by Dyer from the dismissal of his counterclaim, that order clearly is required to be affirmed. What Dyer sought through his counterclaim was an order requiring the Commission to make an investigation and report its conclusions to the court, on whether a certain advertisement run by Union Electric in the St. Louis newspapers, copy of which had been mailed by management to the stockholders, was truthful; on whether Union Electric had made any false or misleading statements to its stockholders between November 16, 1956, and April 12, 1957; and on what relationship there existed, if any, between Union Electric and one of the St. Louis newspapers, which in an editorial had characterized Dyer's activities against Union Electric as those of a publicity seeker.

Section 18(a) of the Act, 15 U.S.C.A. § 79r(a), grants to the Commission the power to make, in its discretion, such administrative investigations as it may deem necessary or appropriate to aid it in effectuating the purposes of the Act. The language used is:

> "The Commission, in its discretion, may investigate any facts, conditions, practices, or matters which it may deem necessary or appropriate to determine whether any person has violated or is about to violate any provision of this chapter or any rule or regulation thereunder, or to aid in the enforcement of the provisions of this chapter, in the prescribing of rules and regulations thereunder, or in obtaining information to serve as a basis for recommending further legislation concerning the matters to which this chapter relates. The Commission may require or permit any person to file with it a statement in writing, under oath or otherwise as it shall determine, as to any or all facts and

circumstances concerning a matter which may be the subject of investigation. The Commission, in its discretion, may publish, or make available to State Commissions, information concerning any such subject".

■■ This is a grant of facilitative administrative authority, in which the Commission has been given absolute discretion as to exercise and exclusive judgment as to field and scope. It is an area in which an individual may make request of the Commission, but in which there is no basis for him to make demand. What is involved is wholly internal administrative power and function, which the courts have no jurisdiction to compel the exercise of. Cf. Crooker v. Securities and Exchange Commission, 1 Cir., 161 F.2d 944; Berlinsky v. Woods, 4 Cir., 178 F.2d 265, 267; General Drivers, etc., v. National Labor Relations Board, 10 Cir., 179 F.2d 492, 494–495. Except as some abuse violative of private right may occur in any exercise made of it, the matter is exclusively one of Commission domain.

The rest of Dyer's contentions do not merit any discussion.

We are sorry that it is necessary, however, to have to add a concluding note on another aspect. Dyer's principal brief here has engaged in expressions of such an improper nature that we cannot judicially ignore them. Some examples follow.

There is a bald assertion that one of the members of the Commission's Staff was "ready to swear to anything that he was told to". There is a naked charge that the Commission "resorted to the manufacture of evidence". An aspersion is made against both judicial and administrative integrity as follows: " * * * SEC * * * exercised its omnipotence as a federal government agency to induce the lower court to express its intent to enter judgment against defendant. How the SEC did that the record does not disclose. Such activities are seldom so disclosed. They come out later".

We shall not here go further. Such irresponsible indulgences are not within the forensic privileges of the bar of this court. They will not be given lodging in our files and records. Dyer's principal brief is hereby stricken from our files and records.

The decree of injunction is vacated, and the case is remanded with directions to dismiss the suit for the reasons set out herein. The order dismissing the counterclaim is affirmed.