J. Raymond DYER, Plaintiff-Appellant,

v.

GLOBE–DEMOCRAT PUBLISHING CO., Defendant-Respondent.

No. 49900.

Supreme Court of Missouri,

Division No. 2.

April 13, 1964.

Motion to Transfer to Court En Banc Denied May 11, 1964.

John T. Sluggett, III, Clayton, for appellant.

Lon Hocker, St. Louis, Hocker, Goodwin & MacGreevy, St. Louis, Missouri, of counsel, for respondent.

ELMO B. HUNTER, Special Judge.

Plaintiff-appellant, J. Raymond Dyer, a St. Louis City attorney, brought suit against the Globe-Democrat Publishing Co., (Globe) a corporation, defendant-respondent, for $100,000 actual damages and $100,000 punitive damages allegedly resulting from a newspaper editorial of March 15, 1957, libeling plaintiff. The editorial read:

"Getting Your Name in Print"

"J. Wesley McAfee, president of Union Electric Company, was a long time lowering the boom on J. Raymo..d Dyer, St. Louis attorney, but Dyer finally got his comeuppance.

"Attorneys, by fiat of the American Bar Association, cannot purchase said advertising. They get around this quaint restriction in the ways which Alice would only describe as curiouser and curiouser.

"Some stand on their head in the lobby of the Metropolitan Opera Company. Others nuzzle close to their clients when the photographer approaches. Some sue public utilities.

"Dyer conceived the idea, for reasons best known to himself of getting into a fracas with the Union Electric Company. His daughter, who is a college student, began compiling lists, with the city's city desks well alerted in advance to her every movement. Union Electric was a bad investment, said Dyer, who promptly confirmed this fact by buying more stock in his own account.

"Mr. Dyer stands convicted by his own words, as Mr. McAfee testified in Washington. In an article in the Harvard Law Review, Dyer stated that 'the game (proxy contesting) is becoming more and more popular. It is a gamble, of course, but if you win it, it can be highly lucrative. Much more lucrative than the average contingent fee damage suit. For, just as in political

contests, to the victor belong the spoils.' End of quote.

"The fact that these battles are enormously expensive to the company—that is, the stockholders—apparently concerns Mr. Dyer very little. The important thing, apparently, is for him to get his name in print, and we are glad to oblige J. Raymond Dyer to that extent."

The defendant counterclaimed for $1,500 actual damages and $100,000 punitive damages allegedly resulting from a federal court case (J. Raymond Dyer v. Globe-Democrat Publishing Company and others, No. 57 C 213(3)) claimed to have been unsuccessfully and maliciously prosecuted by plaintiff against defendant.

The case before us previously has been tried to a jury which was unable to agree on a verdict and the court declared a mistrial. On this, the second trial, at the close of all the evidence the claim and counterclaim were submitted to the jury which found for defendant on plaintiff's claim of libel, and for plaintiff on defendant's counterclaim. Judgment was entered accordingly, and plaintiff has appealed.

The transcript, and exhibits filed separately, are voluminous and we proceed to summarize and set forth only enough of the evidence to enable the reader to understand the issues presented on appeal and our rulings thereon.

The narrative commences on April 11, 1956, when plaintiff bought 100 shares of Union Electric stock (Union) for his daughter Nancy Corinne Dyer, then twenty years old, and a student at Bryn Mawr College. Plaintiff was interested in the utilization of atomic power for production of electricity, and in June, 1956, attended a Washington, D. C. seminar of the Atomic Law Institute, of which he was a member. At that meeting he discussed with others present a June 13, 1956 advertisement which had appeared simultaneously in thirty-six newspapers throughout the country. According to plaintiff the advertisement impled that the American Independent Electric Light and Power Companies, including Union Electric Company, were responsible for the achievements that had been made in the peaceful use of atomic energy whereas actually all such achievements had been made by the Atomic Energy Commission, a government agency.

Plaintiff, on behalf of his daughter, lodged a written complaint with Mr. Woodbridge, vice-president and general counsel of Union Electric Company, denouncing what he termed untruthful advertising. They exchanged correspondence on the subject several times. About November 15, 1956, he read a newspaper article in the Post-Dispatch that there was to be a meeting of the Board of Directors of Union Electric "in connection with the thirty-five thousand dollar lobbying fee that was playing a prominent part in the St. Louis Post-Dispatch and St. Louis Glove-Democrat's issues of several days prior thereto", and went to the offices of J. Wesley McAfee, the president of Union Electric, to obtain permission to attend that meeting. He was refused the requested permission.

Later, plaintiff read what the Globe-Democrat said about that board meeting in its Saturday, November 17, 1956, editorial titled, "The Union Electric Co. Situation". A portion read, "J. Wesley McAfee, president of the Union Electric Company in his statement to his Board of Directors has taken what seems to be a completely honest course when he states quite frankly that his company made a mistake and invites a full and public inquiry by the Securities and Exchange Commission.[1] * * *" Plaintiff also read a reprint of Mr. McAfee's statement to the board and a news article concerning the board meeting and

---

1. The company had employed a Chicago lawyer, J. Roy Browning to assist in getting a bill passed in the Illinois legislature. The $35,000 fee paid to Browning "wound up" in the pocket of Orville E. Hodge, then Illinois State Auditor, who later served a penitentiary sentence for other activities.

mailed them to his daughter at Bryn Mawr. Plaintiff wrote a letter of comment to Mr. McAfee, "pointing out the inaccuracy of his five thousand word statement to the Board of Directors which he had issued to the newspapers and which had been carried in the newspapers as paid advertisement."

Following that plaintiff was called on the telephone by Robert J. Keefe, attorney for Union Electric Company. On behalf of his daughter plaintiff requested permission to examine and make copies of Union's list showing the names and addresses of its stockholders. He testified: "I was refused on the ground that my daughter could not have an attorney because she was a minor."

On December 17, 1956, plaintiff filed in the Circuit Court of St. Louis as next friend his daughter's action in mandamus against Union Electric and certain of its officers, seeking access to the lists and $750 in statutory penalties. The case was tried December 21, 1956, and decided that day in favor of Union on the ground, according to plaintiff, that the inspection demands had been made by plaintiff as attorney for his daughter, and that under the law, "a minor could not have an attorney."

That afternoon Union advised Miss Dyer that she might copy the list. She commenced doing so but had to go back to college after about three-fourths of the names of the stockholders had been copied. She requested that her father be allowed to finish the copying. Her request was denied.

On December 31, 1956, Miss Dyer submitted three proposals to Union, to be voted on by its stockholders at their April 20, 1957 annual meeting. One was to prohibit the expenditures of corporate funds for false advertising or false communications to stockholders, the second was to prohibit the company from engaging in improper lobbying, and the third was that the company accord its minor stockholders the right to act through agents or proxies or attorneys. Union sent those three proposals to the Securities and Exchange Commission ("SEC") with the request that it be permitted to omit them from its proxy material.

. Miss Carmen Kern, a stockholder holding 100 shares of Union's stock, gave plaintiff her power of attorney authorizing him to complete the copying of the names of the stockholders on her behalf. His request to Union on January 2, 1957, to do so was denied. Miss Kern then requested permission to finish the copying. This request was denied. On January 3, 1957, as his daughter's natural guardian under the statute, plaintiff filed a second suit in the St. Louis Circuit Court against Union and certain of its officers, seeking, as he testified, "to compel specific performance of Mr. Keefe's contract with me, and likewise asking for declaratory judgment and for $750.00 statutory penalty". By that suit he was seeking to complete the copying of Union's stockholder list on behalf of his daughter.

On January 11, 1957, while that January 3, 1957 suit was pending plaintiff bought 250 shares of Union Electric stock in his own name, and requested Union to permit him as a stockholder to complete the copying of the list. His request was granted, and he completed the copying shortly thereafter.

On cross-examination, when asked why he and his daughter wanted the list, plaintiff testified that they wanted to be able to communicate with the stockholders of Union Electric so as to bring about a reformation in that company respecting its lobbying and false advertising. When asked why they wanted to reform Union Electric plaintiff testified that he and his daughter had a "very strong interest in morals", and that they believe in "stockholder responsibility". What they hoped to obtain, plaintiff stated, was favorable votes in support of the proposals Miss Dyer had submitted to Union Electric. On further cross-examination plaintiff acknowledged he had given "thought" to the

possibility, that, if successful, the SEC might allow him and his daughter a reasonable attorney's fee. According to him, "You get the legal fee for having persuaded the Securities and Exchange Commission to rule in a particular way after a hearing and all formal proceedings have been held."

Thereafter, plaintiff received a request from the Harvard Law Record for a humorous article having to do with the SEC Proxy Rules.

As submitted by plaintiff to that publication pertinent portions of the article read:

"February 10, 1957.

"The Gentle Art of Proxy Contesting"

"The SEC's New Marquis of Queensbury Rules

" * * * to write about your own case while it is pending I do not subscribe to. * * *

"However, when you have a case that is not before a judicial tribunal, but before a sort of administrative tribunal like a stockholders' annual meeting, maybe the moral restraint should be lifted. * * *

"So, with that as my justification, permit me to say that I was delighted to receive your invitation of February 2 to write about the Union Electric proxy contest. Some vulgar journalists have referred to that highly complex game of legal chess as a 'proxy fight', but I wish to stick to the more dignified term 'proxy contest'. Knowing your erudite readers would not be interested in a blow-by-blow account I shall confine my remarks to the 'rules of the games', i. e. the SEC's Amended Proxy Rules X-14A, as interpreted by the courts and by the Commission.

"These Marquis of Queensbury Rules of Procedure for the fascinating game of proxy contesting are astonishing in their clarity. All were promulgated under that very wholesome section of the Securities Exchange Act of 1934 known as Section 78n (15 USCA 78n) which, in a nutshell, says that all proxy contests must be conducted in accordance with the rules.

"That, of course, is just as it should be. Divorce must proceed in accordance with the rules, and a proxy contest is a species of divorcement. The insurgent stockholders are seeking to divorce the management. * * *

" * * * the new rules vest all stockholders with an interest that permits them, with just a little intelligence and some cooperative action (and some money, of course) to nudge their vested interest managements right out of the corporate nest. If they have a good cause, of course. You must have a good cause.

"The best good cause, naturally, is bad management. And by bad I mean a management that steals the stockholders' money. Or that does not pay dividends. Or inadequate dividends. Stockholders as a class are motivated only by money. If they get what they consider a fair return on their investment they care little how bad morally the management may be.

"Thus, it is very hard to rally stockholders to insurgency on a moral issue. Morals are for the reformers, not stockholders.

"But even a reformer can make do with a little moral issue if it involves money. The Union Electric insurgents are trying it on with 'Truth.' 'Truth in Union Electric' is their slogan. They caught the management out in some fibs, some fibs that cost the stockholders money.

* * * * * *

"How is the moral issue working out in the Union Electric contest? Well, it is working out fine.

* * * * * *

" * * * you have the money tie-in. Whose money? The stockholders' money, being spent to kid them as consumers. Union Electric has spent an admitted $8,100, and I don't know how much more, on consumer-kidding adds that we have charged to the SEC are false. And at least another

$15,000, I estimate, on stockholder-kidding letters-from-the-President that we have charged to the SEC are false.

"Yes, proxy contesting is a fascinating game. Much food for thought. Much opportunity for conjecture. No wonder the game is becoming more and more popular. It is a gamble, of course, but if you win it can be highly lucrative. Much more lucrative than the average contingent fee damage suit. For, just as in political contests, to the victor belong the spoils.

\* \* \* \* \* \*

" \* \* \* The pastures are green, the field is not pre-empted, the Marquis of Queensbury Rules are not too hard to learn, and for sheer intellectual pleasure I know of nothing that can rival proxy contesting, outside of sex."

Mr. Amberg, publisher of the Globe-Democrat, testified that he read the article as published;[2] and that it "triggered" the Globe's editorial "Getting Your Name in Print" which he wrote and which is the basis of plaintiff's libel action. "I read his comments and the general trend was that its great fun to conduct proxy fights. It doesn't cost you very much and if you win, you win enormous stakes. If you lose, what have you lost but a little bit of your time, and that this is a good way, better than a damage suit, I think, or better than accident cases, I think was his phrase, for a lawyer to make money. \* \* \* I was reasonably outraged in that attitude, (which) costs Union Electric and the consumers and the stockholders a great deal of money, and I just don't think that's right. It's not in my opinion, a proper function of a lawyer acting in good faith."

Plaintiff's attorney cross-examined Mr. Amberg on parts of the controversial editorial: " '(Reading) J. Wesley McAfee, president of Union Electric Company was a long time lowering the boom on J. Raymond Dyer.' Did he lower any boom on J. Ray-

mond Dyer? A. Of course he did. He commented before the SEC in Washington very unfavorably on Dyer's atrocious article at the Harvard Law Record. \* \* Q. That's your idea of lowering a boom? A. Certainly. I gave prominence to Dyer's article describing ambulance chasing activities. Q. (Reading) 'But Dyer finally got his comeuppance,' is that right? A. Yes, sir, I think he did. Q. In what respect? A. Because Mr. McAfee convicted him out of his own mouth. We had suspected all along that Dyer's activities were not as a crusader or champion of the common people, but to try to make some money for himself by a proxy fight. That was the point of this whole editorial. Q. When you say 'We suspected all along,' that is, you and your friend J. Wesley McAfee? A. No, Amberg and the Globe-Democrat. \* \* \* Q. (Reading) 'With the City desks well alerted in advance to her (Miss Dyer's) every movement.' \* \* \* Were you ever advised by Mr. Dyer or Miss Dyer that a suit was to be filed prior to this date? \* \* \* A. Our City desk had knowledge, generally, from someone in the Dyer group about this, but my reference was more specifically to the City desk of the other paper that had a great many pictures and stories about Dyer's activities and Miss Dyer's activities which only could have come from them, contacting them. \* \* \* Q. Did they ever approach your City desk? A. Yes, they did."

In support of his claim that the alleged libel caused him loss of earnings and income from his law practice in the years 1957, 1958, 1959, 1960 and 1961 plaintiff testified:

| Year | Gross Income From Law Practice | Net Income From Law Practice |
|------|------|------|
| 1954 | 6,510.93 | 2,819.57 |
| 1955 | 6,352.94 | 3,639.19 |
| 1956 | 6,272.15 | 3,834.16 |
| 1957 | 176.20 | not stated |
| 1958 | 306.40 | not stated |
| 1959 | 1,498.37 | not stated |
| 1960 | 1,116.48 | not stated |
| 1961 | 1,466.36 | 1,504.85 "in the red" |

---

2. As published it omitted several minor paragraphs of no material bearing on the present issues.

On cross-examination plaintiff stated the amount of time he estimated he spent each year on the various Union Electric Company matters varied from "very little" in 1956, to 10% to 15% in 1957, 20 to 25% in 1958, "20 to 25 per cent, maybe a bit more" in 1959. In describing the numerous court and administrative hearings he attended and in which he filed briefs he stated that to write "the brief and reply brief in one of those involved cases, took me at least a month and possibly two months to write both briefs", plus in some cases additional time for the research.

In August, 1959, plaintiff brought suit in the tax court of the United States seeking a redetermination of a tax deficiency for the year 1957 in the sum of $958.36. The tax commission had found and ruled that $10,053.77 total of disallowed expenses incurred by Dyer was disbursed by him "for a fight and/or crusade over proxies of Union Electric Company" and were therefore not expenses incurred in his business for the production of income. Plaintiff under oath stated in his written tax claim:

"5. * * *

"The expenses were all incurred in, or in connection with, litigation, either with said company or the Securities and Exchange Commission. The 'fight and/or crusade', like that known in history as the Fourth Crusade, was conducted (and is still being conducted) for income, as part of said petitioner's business, which is the practice of law, not for pleasure or whim, but for the production and collection of income.

\*     \*     \*     \*     \*     \*

"Said petitioner has sued the St. Louis Globe-Democrat and its publisher in libel for publishing an editorial stating that he was seeking such 'spoils'. That libel suit, which is all part of said petitioner's 'fight and/or crusade' and which is presently pending in the St. Louis Circuit Court as its Case No. 17677, is for money, not hay.

\*     \*     \*     \*     \*     \*

" * * * said Commissioner ignored the fact that said SEC Commissioners will be sued by said petitioner for malicious prosecution, when SEC v. Dyer, supra, has finally been decided in his favor. That suit, like the libel suit against the Globe, will be for money, and will all be part of said petitioner's 'fight and/or crusade'. He is seeking the disqualification of SEC Commissioners Orrick, Patterson, Hastings and Sargent right now, in the U. S. Supreme Court. The case is its Case No. 269, October Term, 1959, in which said petitioner, in conjunction with other Union Electric Co. stockholders, is likewise seeking the disqualification of said J. Wesley McAfee and the reversal of the judgment in Dyer et al. v. SEC et al. (CA8, 1959) 266 F.2d 33. That proceeding is all part of said petitioner's 'fight and/or crusade', which is not being conducted pro bono publico but instead is being conducted as part of said petitioner's trade and business.

\*     \*     \*     \*     \*     \*

"That July 16, 1959 decision of the Missouri Public Service Commission is presently on review in State ex rel. Dyer v. PSC, Circuit Court of Cole County, Mo., Case No. 15736. Those review proceedings were instituted August 11, 1959, by petitioner J. Raymond Dyer, not for fun, not as a nice pro bono publico gesture, but as part of his 'fight and/or crusade', which he is conducting as a trade and business for the production and collection of income."

Through the testimony of defendant's witness Robert J. Keefe the following suits and administrative proceedings initiated or engaged in by plaintiff, together with some indication of the legal preparation, time involved and outcome were described in evidence:

1. Mandamus suit (on daughter's behalf) filed: December 18, 1956 in Circuit Court at St. Louis. Outcome: Dismissed by court, motion for new trial filed and overruled by court; appealed to St. Louis Court of Appeals where judgment of trial court was affirmed, application to have it transferred to Missouri Supreme Court denied by that court.

2. Suit for specific performance by plaintiff to obtain stockholders list from Union Electric Company. Filed: January 3, 1957, in Circuit Court at St. Louis. Result: Suit dismissed by Circuit Court as being without basis; appealed to St. Louis Court of Appeals which upheld trial court's action; application made to Missouri Supreme Court for transfer denied by that court.

3. Mandamus action filed by plaintiff April 1, 1957, in St. Louis City Circuit Court. Result: Judgment against plaintiff, appealed to St. Louis Court of Appeals unsuccessfully.

4. April, 1957 suit against Union Electric Company in Federal District Court to enjoin Union Electric Company and the Globe-Democrat from publishing certain editorials and news articles.

5. SEC hearing participated in by plaintiff at his request in February, 1957, relative to a proxy statement. Result: Proxy statement approved by SEC. On April 3, 1957, plaintiff filed a petition in the United States Court of Appeals for the Eighth Circuit to review the SEC action. Plaintiff traveled to St. Paul, Minnesota to argue the case, and on it being ruled a moot matter applied for certiorari to the United States Supreme Court, which granted certiorari and ordered the Court of Appeals to decide the case as not being moot; that court then affirmed the SEC order.

6. A 1958 SEC hearing relative to the proposed proxy statement for the 1958 stockholders meeting at which plaintiff appeared, filed objections and submitted proposals. When his proposals were rejected, plaintiff filed a petition for review in the United States Court of Appeals in St. Louis and traveled to Omaha, Nebraska to present his argument. The SEC order was upheld.

7. About December of 1958 Union Electric Company made an effort to become exempt from the Utility Holding Company Act. Plaintiff objected and appeared before the SEC at its hearing held in Washington, D. C.

8. A 1959 SEC hearing concerning a proposed proxy statement relative to the 1959 stockholders meeting. There was a contest and a hearing in Washington, D. C. in which plaintiff participated. Plaintiff filed a petition for review in the United States Circuit Court of Appeals in St. Louis and after the customary briefs and oral argument, the SEC order was approved.

9. Also in 1959 Union Electric Company proposed to issue some new shares of stock to raise additional capital and applied to SEC thereon. Plaintiff objected unavailingly and brought a petition for review in the United States Court of Appeals which resulted in the SEC order being upheld.

10. In 1960 Union Electric Company filed a rate schedule with the Missouri Public Service Commission. Plaintiff intervened and objected to some of the rates. He appealed from the commission's order to the Circuit Court of Cole County, and from that court's order to the Supreme Court of Missouri, which affirmed the circuit court and commission's order. He then unsuccessfully applied for certiorari to the United States Supreme Court.

11. Also in March 1960, in connection with the stockholders meeting, he objected to certain matters unsuccessfully and filed a petition for review of the SEC ruling with the Eighth Federal Circuit Court of Appeals.

12. In August, 1961, plaintiff filed an action against J. Wesley McAfee and other directors of Union Electric Company claiming they acted illegally in reference to the acquisition and sale of rights to purchase stock. He later dismissed this suit.

Before closing his case, plaintiff produced several character witnesses (lawyers) who testified his reputation respecting integrity and good moral character "*is*" good. One such witness testified he based his opinion of plaintiff's reputation on talking with

other lawyers who mentioned plaintiff in connection with the various Union Electric litigation matters that arose. "His name was quite often in the paper and as a matter of interest, various lawyers discussed the angles of the case."

In appealing from the adverse jury verdict and judgment, plaintiff makes twelve contentions ("Points") of error. We proceed first to discuss Number XII, "The court below erred in giving, over plaintiff's objections, instructions Nos. 1, 2, 7, and 8."

■ In his motion for a new trial plaintiff has mentioned only instruction number 2. There is no mention of or complaint of error concerning instructions number 1, 7, and 8. It is the rule that allegations of error in the giving of instructions, in order to be preserved for appellate review, must be presented to the trial court in a motion for a new trial. S.Ct. Rule 79.03, V.A.M.R.

In accordance with the rule we confine our consideration to instruction number 2 given by the court on its own motion. Instruction number 2 reads: "The court instructs the jury that under the Constitution of Missouri upon the issue whether the publication for which this action is brought was or was not a libel, *the jury shall determine the law and the facts;* however, you are further instructed that upon all other issues submitted herein, you are bound by the Court's instructions." (Italics ours.)

Article I, section 8 of the Constitution of Missouri, 1945, V.A.M.S., provides, "* * * that in all suits and prosecutions for libel or slander the truth thereof may be given in evidence; and in suits and prosecutions for libel the jury, under the direction of the court, shall determine the law and the facts." Plaintiff contends this constitutional provision does not divest the Judge of his exclusive duty to determine all law matters, and hence, that instruction number 2 is erroneous, citing Bernhardt v. Armbruster, Mo.App., 217 S.W.2d 759; Heller v. Pulitzer Pub. Co., 153 Mo. 205, 54 S.W. 457; Branch v. Publishers:

George Knapp & Co., 222 Mo. 580, 121 S.W. 93; Julian v. Kansas City Star Co., 209 Mo. 35, 107 S.W. 496.

However, a reading of the cited cases reveals that they do not support plaintiff's broad contention. Rather, these cases support the propriety of instruction number 2 as given in this case. In Julian v. Kansas City Star Co., supra, 107 S.W. loc. cit. 507 this court, en banc, said: "The study of this instruction brings into consideration a very peculiar and a very important feature of the law of libel; that is, that the jury are the judges of the law as well as the fact. In deciding the ultimate question of libel or no libel, the jury have the authority to take, not only their own estimate of the evidence, but their own opinion as to the law; and since the jury have that right it is the duty of the court to tell them so. * * * What does the Constitution mean, if it does not mean that the jury have that authority, and if they have, how could it be error for the court to tell them so?" The court further noted it was nonetheless the duty of the trial judge to correctly instruct the jury in all the usual matters, and that this had been done. We note that in the case before us the trial judge gave thirteen instructions covering the case, including seven that were requested by plaintiff.

In the cited case, Branch v. Publishers: George Knapp & Co., supra, 121 S.W. loc. cit. 98, the court in speaking of the constitutional provision concerning libel stated, "In Heller v. Pulitzer Publishing Company, 153 Mo. 205, 54 S.W. 457, this court said: 'Thus in the first instance, upon demurrer or plea interposed by the defendant, the court decides the question of libel or no libel. If the decision is for the defendant, the matter ends as to that court; but if it is against the defendant, the case must go to the jury upon the question of libel or no libel, the court directing the jury as to the general principles of law touching libel; but the jury are at liberty to follow their directions or not * * . *.'" And, in Bernhardt v. Armbruster, supra, the ruling of

the St. Louis Court of Appeals was merely that Article I, section 8, of the Constitution does not relieve the court of its duty to determine whether a petition for libel states a cause of action on which a recovery can be had, citing Diener v. Star-Chronicle Pub. Co., 230 Mo. 613, 132 S.W. 1143, 33 L.R.A.,N.S., 216.

In numerous additional cases the appellate courts of this state have held both directly and inferentially that it is proper for the court to instruct the jury to the general effect that even though the court has instructed them on the question of libel or no libel the constitution gives them the right to determine the law and the facts on that issue. See, Patterson v. Evans, 254 Mo. 293, 162 S.W. 179; Arnold v. Jewett, 125 Mo. 241, 28 S.W. 614; State v. Armstrong, 106 Mo. 395, 16 S.W. 604, 13 L.R.A. 419; Rail v. National Newspaper Ass'n, 198 Mo.App. 463, 192 S.W. 129; Leedy v. Wolf, Mo., 199 S.W. 1002; State ex rel. National Newspapers' Ass'n, Ellison, Mo., 200 S.W. 433; Jacobs v. Transcontinental & Western Air, Inc., 358 Mo. 674, 216 S.W.2d 523, 6 A.L.R.2d 1002. The provisions of Article I, section 8, concerning libel actions have not been changed since first placed in the Constitution of 1875, nor has our interpretation of them. We find no merit in plaintiff's contention to the contrary. Instruction number 2 contains a correct statement of the law, and the trial court did not err in giving it.

Plaintiff's contentions of error ("Points") number I, II, III, IV and VI can be discussed as a related group. Essentially, they charge that the trial court erred in permitting defendant, over plaintiff's objection, to introduce evidence respecting post-publication events for the purpose of showing justification, disproving malice, or limiting damages and that such evidence was beyond the scope of the pleadings. Plaintiff contends that acts or conduct on his part occurring after the date on which the libel was published are not admissible to justify the offense charged,

or to disprove malice or to mitigate or reduce the actual damages. We confess we experience some difficulty with these contentions for plaintiff's brief does not comply with S.Ct. Rule 83.05(a) and (e) in that it occasionally fails to show what particular actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous. Nor does the brief's argument portion substantially follow the "Points Relied On".

Plaintiff's brief discusses Points I, II, III, IV, and VI under the general heading "Post Publication Events" and relates them to two types of evidence. The first type is the evidence that during the years in which plaintiff claimed a reduced law practice he was spending substantial working time with court litigation, SEC actions and other matters involving the Union Electric Company in his "fight and/or crusade" against Union. The second type is evidence consisting of portions of the opinions of three appellate courts concerning some of the above mentioned litigation of plaintiff, which portions were critical of plaintiff's conduct. See, Dyer v. Securities and Exchange Commission, 8 Cir., 291 F.2d 774, 781; State ex rel. Dyer v. Public Service Commission, Mo., 341 S.W.2d 795, 796; State ex rel. Dyer v. Union Electric Company, Mo.App., 312 S. W.2d 151, 154.

The first type of evidence, above mentioned, was elicited from plaintiff during his cross-examination concerning his claimed business losses in 1957-1961 in which plaintiff stated the substantial percentages of time he had spent during those years on litigation involving the Union Electric Company and the Globe, and the testimony of Mr. Keefe on the same subject. This evidence goes to the issue of whether plaintiff suffered any damage from the March 15, 1957 editorial. Its purpose was to show that during the very years for which plaintiff claimed a loss he had little time for or interest in the practice of law, and that it was this voluntary diversion rather than the alleged libelous publication

that caused whatever loss of income he experienced. The evidence was of probative value on an issue in the case. The evidence directly tends to refute plaintiff's claim that he suffered actual damage from loss of income resulting from publication of the editorial. It was not offered to prove justification or circumstances, such as lack of malice, in mitigation of damages. See, 53 C.J.S. Libel and Slander § 250, page 368; 33 Am.Jur., Libel and Slander, Section 289, page 272.

■■ Nor is this evidence beyond the scope of the pleadings. Defendant's answer filed in the case generally denied plaintiff's allegations in his petition to the effect that he had been damaged by the publication of the March 15, 1957 editorial. Evidence tending to show that plaintiff suffered no damage by the publication and that his losses, if any, resulted from his having devoted his time and attention to other matters is within the issues contained in the pleadings. Plaintiff has cited Section 509.-210 RSMo 1959, V.A.M.S. (now S.Ct. Rule 55.22) as supportive of his contention that defendant had a duty to plead "there was no proximate causation between the publication and the diminution of law earnings" to have been entitled to adduce in evidence the mentioned post-publication matters. We have examined the statute.[3] We do not read from it any intent to require a defendant to specifically plead any matter in direct refutation of an essential and pleaded part of a plaintiff's case such as the allegation that the publication was the proximate cause of loss of income in order to be able to adduce evidence thereon. Such evidence may be presented under a general denial. See, S.Ct. Rule 55.10 "Affirmative Defenses"; Patterson v. Evans, 153 Mo.App. 684, 689, 134 S.W. 1030.

Plaintiff contends that in any event the trial court should have limited the mentioned evidence of post-publication activities to the question of plaintiff's claim of loss of income for the years 1957–1961, inclusive. In some instances plaintiff made no objection to such evidence. When he did, the court in overruling the objection usually indicated the basis of his ruling. In one instance the court after being reminded that plaintiff's claim of loss of professional income included the year 1960, overruled the general objection, saying, "It will be permitted to come in for that limited purpose."

■ It is the general rule in a jury case that where evidence is admissible for one purpose or one issue, but would be improper for other purposes or other issues, it should be received, and the objector then has the right to an instruction, if he requests it, limiting the extent to which and the purpose for which the jury may consider such evidence. In the absence of a proper request therefor, the objector cannot successfully complain of the failure of the court to give a limiting instruction. Plaintiff did not seek or ask any such instruction. In accordance with the rule, plaintiff's contention that the trial court erred in not giving a limiting instruction is without merit.

■ In support of his contention that the trial court erred in admitting in evidence portions of the three mentioned appellate court opinions, plaintiff states that an objection of a continuing nature made on September 24, 1962, to "what percentage of time this plaintiff, after the libel suit, engaged in these activities" (suits against Union) should be construed as an objection to admitting in evidence on September 25, 1962, the mentioned portions of the appellate court opinions. Such a construction would be unreasonable for the objection as made does not refer to or include the three judicial opinions. These opinions were not offered as relevant to the "working time

---

3. The alluded to portion of the statute provides: "The defendant may, in his answer, allege both the truth of the matter charged as defamatory and any mitigating circumstances admissible in evidence to reduce the amount of damages; and whether he prove the justification or not, he may give in evidence the mitigating circumstance."

spent" issue but rather as relevant to the issue of plaintiff's reputation and possibly other matters. The objection was to an entirely different matter. An appellant is not permitted to broaden the scope of his objection on appeal beyond that made in the trial court. By failing to make any objection to this evidence at the time it was offered and received in evidence or to take other appropriate and timely action plaintiff has waived any right to complain of it on appeal. Sandler v. Schmidt, Mo., 263 S.W. 2d 35(9); LeGrand v. U-Drive-It Co., Mo., 247 S.W.2d 706(15).

Plaintiff asserts the trial court erred in refusing to sustain his motion for a separate trial of defendant's counterclaim. Plaintiff acknowledges that this is a permissive counterclaim under S.Ct. Rule 55.45 but contends that the first trial which resulted in a hung jury "should have alerted the court to the confusion and procedural difficulties involved in trying the two claims together" and that the trial court abused its discretion in not ordering separate trials. This assertion is not self-proving. The claim and counterclaim involved the same publication and many of the same contentions. We are not persuaded by the record that trying them together presented such "procedural difficulties" or "confusion" as to convict the trial judge of an abuse of discretion in not sustaining the motion. See, S.Ct. Rule 66.02. Plaintiff also now contends a portion of defendant's answer amounted to a plea of estoppel and as an equitable defense should have been separately tried. However, this is a new matter not raised in the motion for a separate trial, nor in the motion for new trial, nor in plaintiff's points and authorities. We refrain from discussing the merits of this new contention as it was not preserved for appellate review and is not properly before us. See, S.Ct. Rules 79.03 and 83.13(a).

Did error result, as plaintiff asserts, from the trial court's refusal to admit Exhibit 13 in evidence? The transcript shows the document was marked by the court reporter. Then defendant's counsel stated: "This is somebody's press release, hearsay three times removed. The Court: "Objection sustained." The marked papers (including a covering letter) consisted of an uncertified, unauthenticated photostatic copy of what appears by its contents to be a statement to the press by a United States attorney giving his opinions and conclusons as to why a federal grand jury had decided there was no federal violation involved in the payment of $35,000 by Union Electric Company to J. Roy Browning which "wound up in Orville E. Hodge's 'brown envelope account' in Edward Hintz's desk at the Southmoor Bank." Neither before or after the objection did plaintiff make any effort to prove the document, and never stated that it was offered in evidence. Plaintiff cites 32 C.J.S. Evidence § 626, page 477. However, that section is authority against plaintiff's claim of error, e. g., "The record or document must be produced from or in the proper custody, and its identity, authenticity, and genuineness must be established. * * * and, in order to be admissible, a report or document prepared by a public official must contain facts and not conclusions involving the exercise of discretion or opinion." The trial court did not err in refusing to admit Exhibit 13 in evidence.

Plaintiff complains of the admission in evidence of defendant's Exhibit B, the petition for a 1957 tax deficiency he had signed under oath and filed with the Commissioner of Internal Revenue and from which document we have previously quoted. The incident arose in the following manner: Defendant's counsel had the document marked as defendant's Exhibit B and advised that he would like to read into evidence extracts from it. There was no objection. He then read to the jury a considerable portion of the document without objection. Upon the completion of the reading to the jury of paragraph 5 plaintiff's counsel referred to that paragraph specifically and asked that it be stricken as not an admission but merely an allegation.

Upon being overruled, he made no objection to the reading of any of the remainder of the document and after it was read asked permission to read the prayer contained in that same petition.

Exhibit B had been prepared and signed by plaintiff. It is reasonable to assume that he knew its contents. The objection to paragraph 5 was not timely in that it came after the full reading of that paragraph to the jury, with no indication plaintiff did not have full opportunity to object before it was read. Thereby, plaintiff has failed to preserve the objection for appellate review. See, Cheffer v. Eagle Discount Stamp Co., 348 Mo. 1023, 156 S. W.2d 591.

Additionally, paragraph 5 did contain admissions against interest relevant both to defendant's plea of truth and to plaintiff's claim of loss of business income resulting from the alleged libel. It is also noteworthy that the other portions of the Exhibit read to the jury without objection said all that paragraph 5 said, and more.

Plaintiff's Point "X" is a general statement to the effect that the question of defendant's privilege is one not proper for jury determination but is for the court and that the court erred in allowing it to be determined by the jury. The point is not related to any particular action or ruling of the trial court. The discussion in the brief titled "defendant's privilege" does not aid in any manner for it also fails to point out what ruling, order or action of the trial court was erroneous. Nor can we find anything in the motion for a new trial that is the counterpart of Point X or on that subject. Thus the point is not preserved on appeal because of the failure to comply with S.Ct. Rules 83.05(e), 79.03 and 83.13(a).

Plaintiff's final point for our consideration is "XI. The court below erred in not ruling as a matter of law that the editorial in question was defamatory of the plaintiff per se, and in leaving that question of whether or not it was defamatory of the plaintiff to the jury." We are unable to locate anything in the discussion portion of the brief designated "XI" that advises how this "Point" is related to any particular ruling or action of the court. Nor can we find any mention of the substance of this point in the motion for new trial. If point "XI" is a charge that the court failed to give a proper instruction offered by plaintiff, it is unfounded, for the transcript discloses that all instructions offered by plaintiff were given by the court, including the verdict directing instruction number 4 containing plaintiff's own statement of what the jury should consider and pass on. "Point XI", as presented, does not comply with S.Ct. Rules 83.05(e), 79.03 and 83.13(a) and is not preserved for appellate review.

The judgment is affirmed.

STORCKMAN, P. J., and EAGER, J., concur.

LEEDY, J., not sitting.